**UNITED STATES v. HALBERT et al., and eleven other cases.**

No. 5922.

Circuit Court of Appeals, Ninth Circuit.

Feb. 24, 1930.

Rehearing Denied March 31, 1930.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash., John T. McCutcheon, Asst. U. S. Atty., of Tacoma, Wash., and James T. Rahily, Associate Counsel, of Washington, D. C.

Stuart H. Elliott and H. G. & Dix H. Rowland, all of Tacoma, Wash., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

Plaintiffs in these cases invoked the jurisdiction of the District Court on the ground that they were entitled to an allotment of lands in the Quinaielt Indian Reservation in the state of Washington, and that this right had been denied by the Secretary of the Interior. Congress has authorized such an action in such a case. 25 USCA § 345, 28 Stat. 305, § 1, 31 Stat. 760, § 1. Fifteen cases were consolidated for trial, and on appeal several of the cases, Indians whose claims were related, were joined, so that the number of allotments involved is greater than the number of cases. Appellees base their right

to allotment upon certain treaties and statutes to which we will now refer.

In 1855–1856 a treaty was signed by Isaac I. Stevens, Governor and Superintendent of Indian Affairs, on behalf of the government of the United States, and by certain head chiefs and subchiefs of the Quinaielt and Quileute Tribes, and by a number of the Indians of these tribes. In the caption of the treaty it is denominated an agreement and convention made and concluded between Isaac I. Stevens, Governor, etc., on the part of the United States, "and the undersigned chiefs, headmen, and delegates of the different tribes and bands of the Qui-nai-elt and Quil-leh-ute Indians, on the part of said tribes and bands, and duly authorized thereto by them." Article 1 of the treaty provides that said tribes and bands cede their right to the lands and country occupied by them which is described in the article, and, according to the statement in the opinion of the Solicitor of the Department of the Interior dealing with the subject, is said to embrace an area extending one hundred miles along the Pacific Coast from Cape Flattery to Grays Harbor and extending inland from twenty to thirty miles, a total area of between two and three thousand square miles. Article 2 of the treaty provides that a tract or tracts of lands sufficient for their wants, within the Territory of Washington (which then included the present state of Oregon), should be selected by the President and set apart for their exclusive use; and provided that "the said tribes and bands agreed to remove to and settle upon the same within one year after the ratification of this treaty, or sooner if the means are furnished them. In the meantime it shall be lawful for them to reside upon any lands not in the actual claim and occupation of citizens of the United States, and upon any lands claimed or occupied, if with the permission of the owner or claimant." Article 3 protected the Indians in the right of taking fish at the usual and accustomed grounds and stations in common with all citizens of the territory and of erecting temporary houses for the purpose of securing the same. Article 6 provided that the President might cause the land to be surveyed into lots and assigned to "such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable." Senate Documents Vol. 38, vol. 2, p. 719; 12 Stat. 971.

Article 6 of the treaty with the Omahas (10 Stat. 1043), article 6, referred to in the foregoing treaty, provides in detail for the method of the allotment to single Indians and families, and provides for forfeiture of the allotment in case the person or family to whom it is assigned should neglect or refuse to occupy and till or shall rove from place to place.

■ In 1887 Congress passed an act (24 Stat. 388, now 25 USCA c. 9, § 331 et seq.) providing for the allotment of lands by the President to individual Indians located thereon. Section 1 thereof, now 25 USCA § 331, provided: "In all cases where any tribe or band of Indians has been or shall be located upon any reservation created for their use by treaty stipulation, Act of Congress, or Executive order, the President shall be authorized to cause the same or any part thereof to be surveyed or resurveyed whenever in his opinion such reservation or any part may be advantageously utilized for agricultural or grazing purposes by such Indians, and to cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian."

The section also contains the following proviso: "Provided further, That where a treaty or Act of Congress setting apart such reservation provides for allotments in severalty in quantity greater or less than that herein authorized, the President shall cause allotments on such reservations to be made in quantity as specified in such treaty or Act. * * * But in such cases allotments may be made in quantity as specified herein with the consent of the Indians expressed in such manner as the President in his discretion may require." It will be observed that this section requires that the tribe or band of Indians be located upon the reservation, and that the individual Indian seeking allotment be located thereon. As was said by Judge Sanborn, speaking for the Circuit Court of Appeals for the Eighth Circuit, in Lemieux v. United States, 15 F.(2d) 518, 521: "No case has been cited, and we have been unable to find any, which holds that a tribal Indian, living apart from the tribe and off the reservation, is entitled to an allotment under section 1 of the act of 1887, and the language of that act seems to preclude such a holding." No one of the appellees resides upon the Quinaielt Reservation. This fact would justify and require the Secretary of the Interior to deny

their applications for allotment under the general allotment law, and would require a denial of their application by the District Court.

█ Appellees, however, have based their claim upon a subsequent statute enacted by Congress March 4, 1911 (36 Stat. 1345), with special reference to allotments upon the Quinaielt Indian Reservation. It is claimed that this statute applies to the appellees, and obviates the necessity for residence. We will first consider whether or not this act obviates the necessity for residence upon the reservation as a condition precedent to an allotment. This act is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior be, and he is hereby, authorized and directed to make allotments on the Quinaielt Reservation, Washington, under the provisions of the allotment laws of the United States, to all members of the Hoh, Quileute, Ozette or other tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute tribes in the treaty of July first, eighteen hundred and fifty-five, and January twenty-third, eighteen hundred and fifty-six, and who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes: Provided, That the allotments authorized herein shall be made from the surplus lands on the Quinaielt Reservation after the allotments to the Indians thereon have been completed."

It is evident from the proviso above quoted that allotments were contemplated to be made to Indians who did not reside upon the Quinaielt Reservation, for it is provided that the allotments authorized by the act should be made from surplus lands "after the allotments to the Indians thereon have been completed." The appellees contend that this proviso altogether obviated the necessity for residence on the Quinaielt Indian Reservation. In order to determine the proper interpretation of this statute, it will be necessary to consider certain facts disclosed by the record. Separate reservations had been set aside for the Hoh Indians, Quileute, the Ozettes, and the Quits. The Hoh Indians were a band of Quinaielt Indians living near the mouth of the Hoh river on the West coast of Washington, having a population of sixty-two in 1905. The Quits, or Quaitso, or Quitz, were probably a part of the Quinaielt Tribe, living on the coast of Washington, north of the Quinaielts, numbering sixty-two Indians in

1906. (See Hand Book of American Indians, Bureau of Ethnology, Bulletin 30, parts 1 and 2, published in 1910 by the Government under the description of "Quinaielt, Quileute, Quaitso and Hoh Indians.") On November 4, 1873, President Grant, by Executive Order, set aside the Quinaielt Indian Reservation of three hundred fifty square miles, bounded on the west by the Pacific Ocean. That order, excluding the date and description of the reservation, is as follows:

"In accordance with the provisions of the treaty with the Quinaielt and Quillehute Indians, concluded July 1, 1855, and January 25, 1856 (Stats. at Large, vol. 12, p. 971), and to provide for other Indians in that locality, it is hereby ordered that the following tract of country in Washington Territory (which tract includes the reserve selected by W. W. Miller, superintendent of Indian affairs for Washington Territory, and surveyed by A. C. Smith, under contract of September 16, 1861) be withdrawn from sale and set apart for the use of the Quinaielt, Quillehute, Hoh, Quit, and other tribes of fish-eating Indians on the Pacific Coast," etc.

Under the general allotment act, the Indians to whom this reservation was made and who resided thereon were entitled to allotments therefrom. Under the same law Quileute Indians residing upon the Quileute Reservation, Hoh Indians residing upon the Hoh Reservation, Quit Indians residing upon the Quit Reservation, were entitled to allotments from these reservations specially set apart for their use, but these reservations were so small that it would be impossible to give each Indian residing thereon the acreage authorized by the general allotment law. By moving from these small reservations to the Quinaielt Reservation the Indians for whom this reservation was established would be entitled to an allotment under the general allotment law. The Act of March 4, 1911, supra, however, provided that the Indians described in the act "who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes," should have an allotment made to them on the Quinaielt Indian Reservation. These allotments the Secretary was directed to make "under the provisions of the allotment laws of the United States." It is a general rule of law that a party is put to his election only when he has two inconsistent rights. In view of this fact, it must be apparent that the Indians who were by this act given a right of election as to whether they would take an allotment upon the special reservation set apart for them or from the larger reservation must

have had a right to selection upon the smaller reservation. In order to have a right to selection upon a smaller reservation, it is necessary that the individual be located thereon. The right given to such an Indian by the Act of March 4, 1911, supra, was the right to select an allotment upon the larger reservation without the necessity of residence on that reservation. The effect of this legislation then is to declare a residence upon one of these smaller reservations equivalent of residence on the larger reservation.

If there is any doubt as to the correctness of the foregoing construction of the statute, it is set at rest by the report of the congressional committee on the act when it was reported to Congress for adoption. This committee report (61st Congress, 3d Session, 1910–1911, House Reports Vol. 2, Miscellaneous 11, Report No. 2152, reported February 11, 1911), incorporated and was based upon a letter from R. A. Ballinger, Secretary of the Interior, to the Chairman of Indian Affairs of the United States Senate, dated February 18, 1910. This report is as follows:

"Department of the Interior, Washington, February 18, 1910.

"Sir: I have the honor to acknowledge the receipt, by your reference of February 3, 1910, of Senate bill 5269, Sixty-first Congress, second session, authorizing allotments on the Quinaielt Indian Reservation, in Washington, to members of the Hoh, Quileute, and Ozette Tribes of Indians.

"By executive order of November 4, 1873, in pursuance of the treaty of July 1, 1855 (12 Stat. L;, 971), there was set aside and reserved for the use of the Quinaielt, Quileute, Hoh, and other tribes of fish-eating Indians of Washington approximately 220,000 acres of land.

"Article II of the treaty of 1855, supra, provided that it would be lawful for the members of the several tribes to reside upon any land not in the actual claim and possession of citizens of the United States for a period of one year pending their removal to the diminished reservation. The diminished reservation was not established until 1873, and a number of the Indians who had not removed thereto at that time continued to live on tracts outside of the reservation even after it was established.

"To protect these Indians in their holdings off the reservation, executive orders of February 19, 1889, and April 12 and September 11, 1893, set aside and reserved approximately 1 square mile each for the Quileute, Ozette, and Hoh tribes, respectively. These small reservations are and have been occupied by the Indians in the form of villages and do not contain enough lands to provide allotments for all the Indians thereon. Members of these tribes who moved to and resided continuously on the Quinaielt Reservation were entitled to and received allotments there.

"The department is of the opinion, therefore, that those members of the Hoh, Ozette, and Quileute tribes who are residing on the separate reservations set aside for them should receive allotments on the Quinaielt Reservation, and would be glad to see Senate bill 5269 enacted into law. Very respectfully, Hon. Moses E. Clapp, Chairman Committee on Indian Affairs, United States Senate. R. A. Ballinger, Secretary."

We conclude that under the general allotment laws only those individual Indians who were living upon the Quinaielt Indian Reservation are entitled to an allotment; that this law has been modified by the Act of Congress March 4, 1911, supra, in so far as the Indian tribes therein designated are concerned, by substituting residence upon the particular reservation set apart for the particular tribe, at the election of the Indian, for residence upon the Quinaielt Reservation. As the appellees do not reside upon any reservation, this construction precludes the ordering of an allotment by the court, unless the statutes expressly applicable to Indians of mixed blood make an exception to the general rule. 25 USCA § 184. We do not understand that the appellees rely upon this statute (25 USCA § 184, 30 Stat. 90, § 1) as applicable to most of the applicants, for the reason that they are not children of an Indian woman and a white man, but they are grandchildren, and therefore do not come within the provisions of the statute. Pape v. United States (C. C. A.) 19 F.(2d) 219; Oakes v. United States (C. C. A.) 172 F. 305.

We have not overlooked the contention that the applicants, notwithstanding their small proportion of Indian blood, are alleged to be Indians, and this allegation seems to be admitted. They base their claim upon the fact that they have been enrolled or acknowledged or recognized as Indians. We find it unnecessary to discuss further the rights of the appellees based upon their Indian blood or tribal relations because of the fact that in any event, not being located upon the reservation, they are not entitled to an allotment.

The judgments are reversed in the following cases in which the following named appellees were plaintiffs in the court below:

No. 299–E, Hilary Halbert, Jr., Dorothy Halbert Hubble, and Mildred Halbert, a mi-

nor, by Hilary Houghton Halbert, guardian ad litem.

No. 300–E, Rich Halbert, a minor, by Fred P. Halbert, guardian ad litem.

No. 301–E, Vernon Sidney Halbert, a minor, by Benjamin F. Halbert, guardian ad litem.

No. 302–E, Sidney E. Halbert, a minor, by Sidney Seth Halbert, guardian ad litem.

No. 307–E, Rose Peers Pickernoll and Mable Peers White, and Amelia Peers Alden.

No. 312–E, Lula M. Elliott, Sophie M. Elliott, Carolyn M. Elliott, Marion E. Elliott, Emma S. Elliott, and Norma C. Elliott, minors, by J. H. Elliott, guardian ad litem.

No. 320–E, Mary Barichio Petit, and Norris Petit, Ellis A. Petit, Oscar Brignone, minors, by Paul Petit, guardian ad litem.

No. 321–E, Dewey Barichio, and Leda E. Barichio, Romie D. Barichio, Andrew B. Barichio, minors, by Vinie Wilson Barichio, guardian ad litem.

No. 324–E, Edna May Elliott, Ruth G. Elliott, William H. Elliott, John G. Elliott, and Frank L. Elliott and Jewell M. Elliott by William A. Elliott, guardian ad litem.

No. 325–E, Chas. G. Elliott, Jr., Anna Marie Elliott, Henry Elliott, Ralph G. Elliott, and Frances Elliott, minors, by Chas. G. Elliott, guardian ad litem.

No. 326–E, Agnes Rubens, Louise Henry Peterson, Mary Henry Hagen, Chris Henry, Jr., and Christine Henry and June Henry, minors, by Louise E. Henry, guardian ad litem.

Case No. 306–E, in which Archie Pollard was the plaintiff in the court below, is reversed, with leave to amend complaint to show, if it be true, that the appellee is entitled to an allotment as a son of a recognized member of the Quinaielt Tribe and of a white man.