### UNITED STATES v. PROVOE et al.
#### No. 5922.

Circuit Court of Appeals, Ninth Circuit.
Feb. 24, 1930.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., both of Seattle, Wash., John T. McCutcheon, Asst. U. S. Atty., of Tacoma, Wash., and James T. Rahily, Associate Counsel, of Washington, D. C.

Stuart H. Elliott and H. G. & Dix H. Rowland, all of Tacoma, Wash., for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

This is a companion case to the case of United States v. Halbert (C. C. A.) 38 F. (2d) 795, and was submitted at the same time and upon the same record as the other companion cases. The decree awarded allotments to all the plaintiffs, and the government appeals. It is alleged in the complaint that the plaintiffs are, and at all times since their birth have been, persons of part Indian blood, over twenty-one years of age, and members of the Quinaielt Tribe of Indians residing in the state of Washington. By way of recital it is further stated in the complaint that Mary Frances Provoe, being a member of an associated and affiliated band of Indians of the Quinaielt Tribe, and a fish-eating Indian of the Pacific Coast and of Western Washington, is the mother of the plaintiffs, other than herself, and that her husband, the father of the other plaintiffs, is an Indian by blood, although his tribe is not stated. It is also alleged that in 1912 a tribal council of the Quinaielt Tribe of Indians, meeting at Taholoh, Wash., recognized plaintiffs as belonging to, and being a part of, the Quinaielt Tribe of Indians. It was further alleged that in 1912 the plaintiffs applied for an allotment which was refused on the ground that no provision had been made for the allotting of timber lands. Thereafter plaintiffs selected certain lands described in the complaint. The Secretary of the Interior had "neglected, refused and declined to allot the said plaintiffs the identical allotments or any allotments of the land upon the Quinaielt Indian Reservation whatsoever. That said denial and refusal of plaintiffs' rights to allotments was for no reason known to plaintiffs, but that such refusal and denial is arbitrary and without reason, and in no manner justified, and is a denial of a right of said plaintiffs," etc. The answer admits that the plaintiffs are of part Indian blood, but denies that they are of the Quinaielt or Quileute Tribes. It is denied that they were recognized by the Quinaielt Indian Tribe as members thereof; it is admitted that the Secretary of the Interior has refused to make an allotment of lands to the plaintiff. The decree contains no findings of fact, but a memorandum opinion of the trial judge is found in the record.

In the appellees' brief it is stated that the undisputed testimony is that appellees "are Chehalis-Cowlitz blood, the father, David Provoe, being born on Cowlitz Prairie and the mother, Mary Frances Provoe, on the Upper Chehalis River."

With reference to the residence of the plaintiffs, appellees state in their brief as follows:

"The facts are that Mary Frances Provoe and Raymond Provoe live upon the Chehalis Reservation, an Indian community among Indian neighbors; Frank Provoe at Oakville, Chehalis Reservation; Laura M. Brown at Black Lake about where she was born, an Indian community; William Provoe at Elma, the dividing line between the territory of the Upper and Lower Chehalis; Sarah Spencer at Moclips on the border of the Quinaielt Reservation among Quinaielt Indians in an Indian settlement."

Mary Frances Provoe testified that she thought she belonged to the Upper Chehalis Indians. The investigation of the allotting agent, C. E. Roblin, who testified in the case, led him to the conclusion that David Provoe, the husband of Mary Frances Provoe, and father of the other plaintiffs, was an Indian whose mother was a Stikin Indian from the Stikin District from Southern Alaska; that his father was a white man; that he was brought to the Cowlitz District and adopted by the Cowlitz Tribe; that he married Mary Frances Provoe, who was born at Tumwater, near Olympia, of a white father and an Indian mother. The tribe of her mother is in dispute; appellants claim that she was of the Nisqually tribe, and plaintiff testified that her mother was from the Black river country. It thus appears that the father of Mary Frances Provoe was a white man and

that the father of her husband was also a white man.

It appears from the memorandum opinion that the trial judge reached the conclusion that Mary Frances Provoe's father was a white man and her mother a Chehalis Indian; that her husband's father was French and his mother a Stikin Indian of Alaska adopted by the Cowlitz Tribe; that Mary Frances Provoe by her marriage in 1870 to David Provoe, a Cowlitz Indian by adoption, took his status, and by her marriage became a Cowlitz, and their children should be classed as Cowlitz; that, whether classed as Upper Chehalis or Cowlitz, the plaintiffs are entitled to an allotment. The only justification for the allegation that the appellees are Quinaielt Indians is the claim that they were recognized as such by a tribal meeting held in 1912. At that meeting appellees made formal application for adoption. They were adopted by the Indians, but this adoption was disapproved by the Secretary of the Interior, and therefore had no effect. Mitchell v. U. S. (C. C. A.) 22 F.(2d) 771. The foregoing statement will indicate how far the evidence and the opinion of the court depart from the allegations of the complaint and that the trial court based its decree, as it appears from the opinion, upon the conclusion that the plaintiffs were Cowlitz Indians and not Quinaielt Indians, as alleged in the complaint. Plaintiffs do not allege that they are Cowlitz Indians, and it does not appear from the record that the Secretary of the Interior was ever asked to make an allotment to the plaintiffs because they were Cowlitz Indians. The complaint should state the facts upon which the action of the court is sought with particularity, and it should appear therefrom that the claim to an allotment presented to the court theretofore had been presented to the Secretary of the Interior, and has been denied by him. The court has no authority to consider the question of allotment, unless and until it has been denied by the Secretary. It is only because of his alleged error in denying the application that the court is authorized and required to act. It was certainly not contemplated by this remedial legislation that, where a claim had been made to the Secretary of the Interior for an allotment, and had been denied by him, the court should be called upon to consider an entirely separate and distinct claim as a basis for an allotment.

In the case at bar, the court should not be called upon to determine whether Cowlitz Indians are entitled to participate in the allotment of lands in the Quinaielt Indian Reservation where the Secretary of the Interior has denied a claim based upon the allegation that the petitioners are Quinaielt Indians. Apparently this case was tried below without any objection to the evidence adduced by the appellees. Witnesses were permitted to express their opinion as to the intention of Congress in passing the Act of March 4, 1911 (36 Stat. 1345), and their opinion concerning the interpretation of the executive order of November 4, 1873, and evidence was also adduced as to the meaning placed by Indians residing upon the Quinaielt Indian Reservation upon the clause of the act of Congress of March 4, 1911, relating to the tribes therein referred to as affiliated with the Quinaielt and Quileute Tribes in the treaty of 1855–1856. Because of this situation, and because such point is not made on appeal, we will ignore the variance between the proof and the pleadings otherwise than by calling attention to the difficulties confronting this court where such lax practice is permitted. We cannot act here upon the rule which on appeal gives weight to the determination of the trial court upon evidence adduced before him and upon the opportunity of the judge to determine the weight and value of the evidence in cases of conflict where the witnesses appear before him, for it is at once apparent that the evidence is wholly at variance with the allegation of the complaint and with the implied finding of the truth thereof. We proceed to consider the question as to whether or not under the evidence the plaintiffs are entitled to an allotment.

As has been pointed out in the companion case, U. S. v. Halbert, the Act of March 4, 1911 (36 Stat. 1345), excuses residence upon the Quinaielt Reservation, and substitutes therefor residence upon a reservation set apart for the particular tribe, in the case of the Quileute, Hoh, and Ozette, and other tribes affiliated with the Quinaielt and Quileute Indians in the treaty of 1855–56 (12 Stat. 971). In the case under consideration, Mary Frances Provoe and some of her children are living upon the Chehalis Reservation. If the Cowlitz or Upper Chehalis Indians are covered by the Act of March 4, 1911, supra, which substitutes residence upon the tribal reservation for residence upon the Quinaielt Reservation, at the election of the Indian (United States v. Halbert, companion case), then the residence of those plaintiffs and appellees upon the Chehalis Reservation would justify an allotment up-

on the Quinaielt Reservation. The question then is whether or not the Cowlitz or Upper Chehalis Indians were affiliated with the Quinaielt and Quileute Tribes in the treaty of 1855–56, within the meaning of the Act of March 4, 1911, supra.

The interpretation suggested for this phrase of the Act of March 4, 1911, supra, by the appellant is as follows: " * * * It seems clear that the tribes who were 'affiliated' in the treaty were those who signed the treaty, and those who were supporters of the treaty signers, in the accomplishment of treaty making and, conversely, that those tribes or bands of Indians who declined to participate as principals in the treaty making, including their adherents, were not 'affiliated' with the Quinaielts and the Quileutes in the treaty of 1855–56."

Appellants claim that the Chehalis and Cowlitz Indians declined to enter into the treaty at all.

The position of the appellees is that all of the tribes at Cosmopolis, Wash., in 1855, who engaged in the negotiations leading up to the signing of the treaty, are affiliated in the treaty within the meaning of the Act of March 4, 1911, supra. These tribes include the Upper and Lower Chehalis, Chinook, Cowlitz, Hoh, and Quit Indians, whose representatives were there present. If, therefore, the presence of the Upper and Lower Chehalis tribal representatives at Cosmopolis, in 1855, and their participation in the negotiations for a treaty, brought them within the purview of the act of Congress as affiliating in the treaty with the tribes that signed it, the residence of such appellees as resided upon the Chehalis Reservation is substituted for residence upon the Quinaielt Reservation. United States v. Halbert, supra. We will now consider that question.

By the Act of March 4, 1911 the Secretary of the Interior was authorized and directed to make allotments on the Quinaielt Reservation, Wash., under the provisions of the allotment laws of the United States, "to all members of the Hoh, Quileute, Ozette or other tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute tribes in the treaty of July first, eighteen fifty-five and January twenty-third, eighteen fifty-sixth, and *who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes:* Provided, That the allotments authorized herein shall be made from the surplus lands on the Quinaielt Reservation after the allotments to the Indians thereon

have been completed." In view of the fact that the treaties referred to in this enactment were signed on the part of the Indians by the head men and members of the Quinaielt and Quileute Tribes only, it is obvious that the benefits of the enactment were not limited to these two tribes, and that we must, if possible, place some construction upon the phrase, "or other tribes of Indians in Washington who are affiliated," etc. The general words "other tribes affiliated" in the statute are limited by the special words in the statute, naming particular tribes immediately preceding the general phrase "other tribes," etc.; under the familiar rule of statutory construction of ejusdem generis, to other tribes related or affiliated, as the Hoh, Quileute, and Ozette Tribes are, or were, affiliated with the Quinaielt and Quileute Tribes. Hills v. Joseph (C. C. A.) 229 F. 865, 868, 869. The Hoh Indians were a band of Quileute Indians living at the mouth of the Hoh river, about fifteen miles south of Lapush, the main seat of the tribe on the west coast of Washington. In 1905 they had a population of 62 (No. 1 Hand Book of American Indians, Bureau of Ethnology, p. 556, published in 1910). The Quits similarly were a subdivision of the Quinaielt Tribe. It would thus appear that the Quits were affiliated with the Quinaielt Indians in the same way that the Hoh Indians were affiliated with the Quileute Indians; that is to say, both the Hohs and the Quits were tribes or bands of tribes signing the treaty, and were by the terms of the treaty bound thereby. See treaty quoted in United States v. Halbert, supra; 12 Stat. 971. The phrase in the statute, "other tribes affiliated," etc., is evidently applicable to the Quit Tribe, and this fact gives sufficient meaning to the phrase to justify its use and satisfy its terms, even if there were no other tribe similarly affiliated with the Quinaielt and Quileute Tribes in the treaty and not specifically mentioned therein. The question then is, Were the Upper Chehalis or Cowlitz Tribes affiliated with the Quinaielts and Quileutes in the treaty as the Hohs were affiliated. The condition and relation of the tribes at the time of the treaty was testified to by the witness Charles E. Roblin, special allotting agent of the Interior Department, as follows:

"That the act of 1911 is the latest act having to do with the Quinaielt reservation as far as he knows; that from his best knowledge from a study of the Treaty, etc., the signators to the treaty of 1855–56 are the Chiefs, Headmen and delegates of the

different bands and tribes of the Quinaielts and Quileute Indians in Western Washington; that in 1855–56 an agreement was reached (as previously testified) between representatives of the government and of the tribes that met at Cosmopolis, but not signed, and later a few men of the tribe went somewhere and signed a paper purported to be a treaty; that without explanation that does not look so good; that the Chinooks, Cowlitz, Chehalis, Quileutes and Quinaielts, Hohs and Queets were all at the meeting as Cosmopolis in 1855, and all associated in preliminary arrangements in making that Treaty; that history shows that the Chinooks, Cowlitz and Chehalis Indians refused to sign that treaty and that the treaty as finally drafted and signed was made at Olympia by the men whose names appear in this report of it; but that in Mr. Swan's book published in 1857, two years after the treaty, on page 345, an explanation of the failure of the Chinooks, Cowlitz and Chehalis Indians to sign that Treaty is given, being, briefly that they, the Chinooks, Cowlitz and Chehalis Indians, understood from the Governor that the reservation to be created for all parties would be located in the Quinaielt country, and they did not want to go there, because they were not friends, and if they (a Chinook leader speaking) 'went north among the other tribes they would fight and soon all be killed,' and this same idea was expressed by all and repeated each day of the tribal council. So they tore up the treaty and refused to sign it. The statement, as it appears on page 345 of Swan's report of that treaty in 'The Northwest Coast or Three Years' residence in Washington Territory' was an extract from the speech of one of the Chinook Chiefs and repeated by all."

If this is true, it seems clear that, as the Chinooks, Cowlitz, and Chehalis Indians refused to sign the treaty or be bound by its terms, and particularly refused to live upon the reservation provided them in the treaty, they cannot be said to be affiliated in the treaty in any true sense of the term "affiliated." Furthermore, the Cowlitz Tribe is defined in the Hand Book of American Indians, vol. 1, p. 355, House Documents 59th Congress, First Session, 61, as follows: "A Salish Tribe formerly on the river of the same name in S. W. Washington. Once numerous and powerful, they were said by Gibbs in 1853 to be insignificant, numbering with the Upper Chehalis, with whom they were mingled, not more than 165. About 1887 there were 127 on the Puyallup res., Wash. They are no longer known by this name, being evidently officially classed as Chehalis."

Moreover, it should be noted that there is no evidence as to what tribes were represented at the final meeting at Olympia nearly six months after the Cosmopolis negotiations were had, other than the fact that the treaty was signed by the Quinaielt and Quileute Indians. If other tribes affiliated in the treaty at Cosmopolis by joining in the negotiations, they did not do so at Olympia. The meeting at Cosmopolis was to arrange a treaty for the cession of the lands of all the tribes there represented extending as far south as the Columbia river, while the territory actually ceded in the treaty signed six months later at Olympia extended no further south than the ridge separating the Quinaielt and Chehalis river, which in the main did not cover the territory occupied by the Upper Chehalis, Chinook, and Cowlitz Tribes, and by that part of the Lower Chehalis Tribe around Grays Harbor, although it should be noted that the Solicitor General of the Interior Department referred to the division line as extending to Grays Harbor. See statement quoted in United States v. Halbert. As we have indicated heretofore, those purporting to be bound by the terms of the treaty were the Quileute, Quinaielts, and "tribes and bands" of these Indians which includes the Hohs and Quits, and does not include the Chinooks, Chehalis, or Cowlitz Indians, which were independent tribes. In this connection it may be stated that the Department of the Interior had the allotting agent, Charles E. Roblin, call a meeting of the old members of the tribes to ascertain their understanding of what tribes were affiliated with the Quinaielts and Quileutes "in making the treaty" of 1855–56, supra. He testified with relation to that meeting as follows:

"On December 12, 1919, he presided at such council with about 70 or 80 in attendance and quite a number of the old men told their recollection of what had been told them; this was all incorporated in a report to the Secretary of the Interior and eight or ten of the chief men of the tribe signed the statement; they stated the Indians affiliated with the Quinaielts and Quileute Indians in 1855 and 1856 Treaty were the Hohs, Queets and the Humptulips, and specifically stated that the Chehalis Indians did not affiliate with them in making the treaty."

The Indians present were no doubt competent to give an opinion of the relationship

of the Indian Tribes as a matter of pedigree, but we do not wish to seem to subscribe to the doctrine that they were competent to interpret an act of Congress, because we consider their conclusions as to tribal relationships.

We conclude that the Chehalis Indians, both Upper and Lower, and the Cowlitz were not affiliated with the Quinaielt and Quileute Tribes in the treaty within the meaning of the Act of Congress of March 4, 1911, supra; that therefore the residence of such of the plaintiffs in this case, as lived upon the Chehalis Reservation, was not the equivalent of residence upon the Quinaielt Reservation, and that they are therefore not entitled to an allotment of land upon the Quinaielt Reservation as Indians of the Cowlitz or Chehalis Tribes, unless they reside thereon. We are not called upon to consider the case of a Humptulip Indian.

It remains to consider whether the plaintiffs in this case are entitled to an allotment in the Quinaielt Reservation which they may assert, notwithstanding the fact that they neither live on the Quinaielt Indian Reservation or any other reservation set apart for a tribe affiliated in the treaty. The Indians for whom this reservation was set apart are designated in the executive order of November 4, 1873, as the Quinaielt, Quileute, Hoh, Quit, and "other tribes of fish-eating Indians on the Pacific Coast," and, in view of the phrase of the proclamation expressing a purpose "to provide for other Indians in that locality," the part of the Pacific Coast referred to is further limited to the locality.

Mary Frances Provoe is the daughter of a white man married to a Chehalis Indian (or Cowlitz). It was conceded by the government in the court below that the Lower Chehalis Indians were entitled to allotments on the Quinaielt Indian Reservation. As we understand it, this concession was made upon the theory that the Lower Chehalis Indians were fish-eating Indians on the Pacific Coast in that locality within the meaning of the order setting aside the reservation, and thereby entitled to an allotment under the terms of the general allotment act. The trial court, in its memorandum opinion, declined to determine whether or not the mother of Mary Frances Provoe was an Upper or Lower Chehalis Indian, upon the theory that in either event she was entitled to an allotment. As we have indicated, her right to an allotment under the general allotment law, as modified by 25 USCA § 184, concerning the right of a child of an Indian

mother and white father, which we think excuses residence in the reservation as a prerequisite to allotment in such cases, depends upon the question as to whether her mother was a recognized member of one of the tribes for which the Quinaielt Indian Reservation was set aside, and this depends in part upon the terms of the proclamation of November, 1873. While the evidence in the record would seem to indicate that Mary Frances Provoe was an Upper Chehalis, rather than a Lower Chehalis, Indian, we feel that that question can be better determined by the trial judge than by us, either upon the oral evidence already adduced before him or from such additional evidence as may be offered by the parties. For that reason we leave that question to be determined by the trial judge upon further proceedings not inconsistent with this opinion, nor do we wish to be understood as determining whether or not Upper Chehalis Indians are provided for by the proclamation.

■ It remains to now consider the rights of the appellees, who are children of Mary Frances Provoe, as a result of her marriage with David Provoe, by reason of their recognition by the Quinaielt Indians. They were not entitled to any interest in the tribal property by reason of their mother's Indian blood. Their rights, if any, are dependent upon the status of their father, who, it is claimed, was adopted by the Cowlitz Indians although the son of a white man, or upon their own relation to the Quinaielt Indians. Mary Frances Provoe and the children, appellees, applied to a meeting of the Indians upon the Quinaielt Indian Reservation for adoption. Their application was approved by the Indians in that meeting, but this action was disapproved by the Secretary of the Interior. It is conceded that the consent or approval of the Secretary of the Interior is essential to a valid adoption [Mitchell v. United States (C. C. A.) 22 F.(2d) 771, supra]; that assent having been withheld, the adoption is ineffective for any purpose. Appellees, however, contend that the action of the Indian council, although futile as an adoption, was nevertheless a recognition that they are Indians of the Quinaielt Tribe. This position cannot be sustained. If, in fact, they were not members of the Quinaielt Indian Tribe, the recognition of them, as such, could give them no rights, unless that recognition amounted to an adoption. If we assume that they are members of the Cowlitz Indian Tribe, as the trial court held, by reason of the adoption of their father by said tribe, they could not become members of the

Quinaielt Tribe except by adoption by that tribe approved by the Secretary of the Interior. We find no basis in the record for an allotment on the Quinaielt Indian Reservation to the children of Mary Frances Provoe as Quinaielt Indians. If they have any just claim to an allotment not disclosed by the record, such claims should first be presented to the Secretary of the Interior, and, if rejected by him, may be presented to the District Court by petition, according to law. To permit such claims to be presented in the first instance, the District Court, without presentation to and rejection by the Secretary of the Interior, would in the last analysis throw a large part of the burden of the administration of Indian reservations upon the court rather than upon the executive officer charged therewith, and who,-by reason of the long course of dealings with the Indian tribes, is familiar with the facts, and would be unauthorized by the legislation invoked as a basis for the jurisdiction of the District Court.

Decree reversed, and case remanded for further proceedings not inconsistent herewith.