UNITED STATES, as Trustee, etc., and ex rel. CHARLEY et al. v. McGOWAN et al.

SAME v. BAKERS BAY FISH CO. et al.

No. 6858.

Circuit Court of Appeals, Ninth Circuit.

Jan. 16, 1933.

Anthony Savage, U. S. Atty., and Tom De Wolfe and Hamlet P. Dodd, Asst. U. S. Attys., all of Seattle, Wash., and W. H. Smiley, of Hoquiam, Wash., for the United States.

Kelly & MacMahan, of Tacoma, Wash., for appellee Bakers Bay Fish Co.

John H. Dunbar, Atty. Gen., and E. W. Anderson, Asst. Atty. Gen., for appellee State of Washington.

Before WILBUR and SAWTELLE, Circuit Judges, and CAVANAH, District Judge.

WILBUR, Circuit Judge.

Two actions were brought by the United States, as trustee and guardian of the Quinaielt and Quillehute Indians and particularly the three Indians named in the bill, George Charley, Mitchell Charley, and Roland Charley, to enforce the rights of these two tribes of Indians in certain fishing grounds at the mouth of the Columbia river.

The decision of the trial court was adverse to the contention of the government. It is conceded on appeal that as to the Quillehute Indians the decree is right. The rights which the government seeks to enforce are those granted or reserved by article 3 of the treaty entered into with the Quinaielt and other Indian tribes on the 1st day of July, 1855, and the 25th day of January, 1856, ratified by the United States Senate on March 8, 1859, and accepted and proclaimed by the President of the United States on April 11, 1859 (12 Stat. 971), which is as follows:

"Article III. The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing the same; together with the privilege of hunting, gathering roots and berries, and pasturing their horses on all open and unclaimed lands. Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens. * * * "

Similar provisions contained in other Indian treaties made about the same time were considered by the Supreme Court in U. S. v. Winans, 198 U. S. 371, 25 S. Ct. 662, 49 L. Ed. 1089, and Seufert Bros., etc., v. U. S., 249 U. S. 194, 39 S. Ct. 203, 63 L. Ed. 555. A discussion of the particular treaties involved in this action, and of the facts surrounding their execution, is contained in our decision in U. S. v. Halbert, 38 F.(2d) 795; Id., 283 U. S. 753, 51 S. Ct. 615, 75 L. Ed. 1389.

About one hundred fifty-eight Quinaielt Indians participated in the making of the

treaty. The trial court arrived at the conclusion that the evidence was insufficient to show that the mouth of the Columbia river was used by the Quinaielt Indians as a usual and accustomed ground or station for fishing.

The appellant contends that the undisputed evidence shows that long before the treaty was entered into, the Quinaielt Indians had been using the mouth of the Columbia river as an accustomed place of fishing, and that the evidence of the appellee as to nonuse all related to dates later than the treaty and later than those testified to by the Indian witnesses, and that therefore, there was no conflict between the evidence of the government and the evidence adduced on the subject of use by the appellees. Before further discussion of the evidence in that regard, the general situation disclosed by the evidence with regard to conditions at the mouth of the Columbia river at the time of the treaty should be stated, and in this connection it should be said that the appellees do not rest their case upon the broad ground taken by the trial judge to the effect that the Quinaielt Indians did not, at and prior to the time of the treaty, use any part of the mouth of the Columbia river for fishing purposes, but upon the narrower ground that the evidence entirely failed to show that the particular location within the estuary, as described in the complaint, was so used.

A large number of maps showing the conditions at the mouth of the Columbia river and the location in question, from time to time, were offered on behalf of both parties. The earliest map is dated 1792. There are maps dated 1839, 1851, 1854, and many later maps. It appears from these maps that the underwater conditions at the mouth of the Columbia and between Cape Disappointment on the north, and Point Adams on the south, have been subject to constant change, that this change was accelerated by the building of the south jetty extending in a westerly direction from Point Adams on the south side of the Columbia and the north jetty extending in a southwesterly direction from Cape Disappointment on the north side of the Columbia river. The south jetty was begun in 1885 and completed in 1912. The north jetty was constructed in 1916. At the time of the treaty there was open water from Point Adams to Cape Disappointment, the only land appearing above the surface of the water was Sand Island, at that time about 3¼ miles southeasterly from Cape Disappointment and not on the line between that Cape and Point Adams. What is called the north channel extended across the area described in the complaint, the water having a depth of from 3¼ to 6 fathoms where the land which is called Peacock Spit is now located. This spit of land now extends southeasterly from Cape Disappointment. Sand Island shown on the map of 1854 has gradually moved by the process of accretion and attrition, until it is now less than half a mile directly east of Sand Island, and has grown in size from less than one-half mile to more than two miles in length. Peacock Spit is bare at high tide. It is a relatively recent growth, although shoal water extending southwesterly (not southeasterly as at present) from Cape Disappointment had been long known as Peacock Spit by reason of the wreck of a ship of that name in that location. Such a shoal is first shown on the Coast Survey Map of 1851. As early as 1885 there was a small island, dry at low tide, immediately south of the present location of Peacock Spit and extended to a very small extent into the area now occupied by Peacock Spit. This island had completely disappeared before Peacock Spit emerged from the water in that location. Sand Island by 1885 had moved to approximately its present position, being about half a mile further east than its present location. Under these circumstances it is of course not contended that the Quinaielt Indians ever fished from Peacock Spit as a usual and accustomed fishing place. Since it was formed it has been leased by the state of Washington to the appellee Bakers Bay Fish Company at an annual rental of $36,000; the lease having been secured by that company in pursuance of its bid at public auction conducted for the purpose of leasing the fishing rights on that spit to the highest bidder. These rights are very valuable because it is the habit of the salmon in entering the Columbia river to linger at the mouth and in the estuary for about two weeks before going upstream, and the availability of the shore of the spit for landing seines is the feature which makes the fishing rights from the shore of Peacock Spit so valuable.

The claim advanced on behalf of the Quinaielt Indians is that at and prior to the treaty they were accustomed to fish in the immediate neighborhood of Cape Disappointment and in the general area in which Peacock Spit has since been formed; that this fishing was partly for sturgeon which are speared in relatively deep water, and also for salmon.

The trial judge rendered an opinion in which he reviewed at length the evidence taken before him and stated his conclusions as to its credibility. In addition thereto, find-

ings of fact and conclusions of law were rendered by the trial judge. Among others is finding No. XVII, as follows:

"That the estuary of the Columbia river, while beyond question usually and customarily resorted to as a fishing ground of the Chinook tribe of Indians, was not usually and customarily or frequently resorted to by the Quinaielt or Quillehute tribes of Indians for the purpose of fishing; that any fishing done by such tribes in the estuary of the Columbia river at or prior to the time of the treaty was occasional rather than a usual and customary practice."

█ It is true that in an equity case the evidence is reviewed by this court, but it is a fundamental rule that, where the witnesses testify in person before the trial judge he is in a better position to pass upon the credibility of a witness than this court, and we will follow the decision of the trial judge unless it is clearly apparent that his decision is erroneous. Savage v. Shields (C. C. A.) 293 F. 863; Easton v. Brant (C. C. A.) 19 F.(2d) 857; Jones v. Jones (C. C. A.) 35 F.(2d) 943. The court rejected the testimony of a large number of witnesses adduced by the government as not worthy of full credit. This testimony, if accepted at its face value, would establish the fact that Quinaielt Indians had been using the mouth of the Columbia river long before the white man arrived in the vicinity and continued so to do up to and after the time of the treaty.

The findings, as well as the opinion, disclose some of the reasons which influenced the court in qualifying and rejecting this testimony. Among other facts which influenced the conclusion of the court are those stated in the findings, and which we may summarize as follows:

That the Quinaielt Indian Tribe was located about 60 miles north of the Columbia river; that this was about six days' march northwest from the estuary of the Columbia; that between the reservation and territory occupied by the Quinaielt Indians and the mouth of the Columbia river there is a large harbor known as Gray's Harbor, into which flowed six rivers, and between Gray's Harbor and the mouth of the Columbia river was the Willapa Harbor, otherwise known as Shoalwater Bay, which extends approximately 20 miles from north to south and indents the coast from 10 to 12 miles; that ten rivers flow into this bay; that the Chinook Indians resided on both banks of the mouth of the Columbia river; that they are a different family of Indians from the Quinaielts and Quillehutes, with an entirely separate and alien language.

"That the Chinooken family was a wholly separate and alien family from the Salishan, to which the Quinaielts and Quillehutes belong, with an entirely separate and alien language; that the Chinooks occupied both sides of the Columbia river estuary and the greater part of Shoalwater Bay; that Shoalwater Bay was largely occupied by the Willopah tribe, a branch of the Chinooks, who are now extinct; that any Indian villages situated on Cape Disappointment, or on the shores of Baker Bay, including that village which has been referred to in the evidence as Chenamus village, were Chinooks and not Quinaielt villages; that there was an abundant supply of fish and shell fish of many varieties in Shoalwater Bay and in the rivers which flow into said Bay and Grays Harbor and the Pacific Ocean to the north of the Columbia river and there was, therefore, no necessity for the Quinaielts going on a six days march for the purpose of securing fish for their sustenance.   *   *   *

"That there has never been any protest or claim touching the fishing rights at the mouth of the Columbia river asserted by any Quinaielt or Quillehute tribal counsel; that the individual claims so asserted are rather on behalf of those who are as closely related to the Chinooks, white or otherwise than to the Quinaielt and Quillehute tribes; that the Chinook tribe never executed any treaty with the United States similar to that of the Quinaielt and Quillehute tribes."

In addition to these facts found by the court which tends to minimize the evidence that the Quinaielt Indians habitually fished in the mouth of the Columbia river, the trial judge stated in his opinion other matters which tended to discredit the testimony. These considerations may be briefly epitomized in part as follows:

(1) Most of the witnesses who testified for the plaintiff were not of pure Quinaielt blood, while it would be expected that those of pure Quinaielt blood would more accurately know and testify to the traditions of the Quinaielt people.

(2) That the witnesses of Chinook blood were not disinterested witnesses in view of the fact that the fishing operations testified to as having been conducted under the direction of George Charley and other Indians of part blood with crews of 30 or more were predominately of Chinook blood; consequently

it is anticipated that, if fishing operations continued, these Chinook witnesses who testified in favor of the Quinaielt and their tribesmen would be allowed to continue to fish.

(3) With reference to the witnesses who were allottees on the Quinaielt reservation, the trial judge states that there is nothing to show whether they were members of the Quinaielt Tribe by adoption, or, if so, whether they became members of the Quinaielt Tribe at the time of the treaty or were of such ancestry; that there was no testimony as to any protest by the Quinaielt tribal council, although the fishing rights now claimed had been frequently interfered with; and that the evidence shows that as to the individuals whose claims are advanced in the case such claims are made rather on behalf of those closely related to the Chinooks, white, or otherwise, than on behalf of the Quinaielt Tribe; that at about the time of the making of the treaty the chief of the Quinaielts was unable to speak the "Chinook jargon," indicating that he was not accustomed to fish in their territory; that the Indian Agents for the Quinaielt Tribe had made no report concerning this place as a fishing ground; and that no entry in the journals and reports of the agents, officers, or employees of the companies operating at the mouth of the Columbia river before the treaty had been offered showing or tending to show that Quinaielt Indians were accustomed to resort to the mouth of the

Columbia river for the purpose of fishing. The trial judge states that, to accept the testimony of the witnesses who had testified as to the use of the mouth of the Columbia as a usual and accustomed place of fishing by the Quinaielts, he is required to find in effect that the Quinaielt and Quillehute Tribes made a six-day journey from their residence to the heart of a territory of another tribe of alien speech (Chinook), and that they fished within sight of the principal Chinook village in the entire Chinook group, and he declines to so hold.

The opinion of the trial judge gives evidence of a painstaking effort to arrive at a just conclusion as to the weight and effect to be given to the positive and direct evidence tending to support the claims of appellant, and, for reasons carefully stated in detail by the trial judge, he rejects the testimony as not credible. We cannot disturb this conclusion. To do so would substitute our judgment based upon the cold record for the conclusions of the trial judge who saw, heard, and observed the witnesses and thus had an opportunity to consider the reliability of their memory and the accuracy of their observations and their disposition, if any, to take advantage of the fact that they were in part testifying to traditions and hearsay and the extent to which their testimony might be colored, exaggerated, or intentionally false by reason of their interest in the controversy.

Decree affirmed.