HILARY HALBERT, JR., ET AL. *v.* UNITED STATES.

RICH HALBERT *v.* SAME.

VERNON SIDNEY HALBERT *v.* SAME.

SIDNEY E. HALBERT *v.* SAME.

PICKERNOLL ET AL. *v.* SAME.

LULU M. ELLIOTT ET AL. *v.* SAME.

PETIT ET AL. *v.* SAME.

BARICHIO ET AL. *v.* SAME.

EDNA MAY ELLIOTT ET AL. *v.* SAME.

CHAS. G. ELLIOTT, JR., ET AL. *v.* SAME.

RUBENS ET AL. *v.* SAME.

WALKOWSKY ET AL. *v.* SAME.

ROLFSON ET AL. *v.* SAME.

PROVOE ET AL. *v.* SAME.

Nos. 141–154. Argued March 11, 12, 1931.—Decided June 1, 1931.

---

[7] *Jennings* v. *Wood,* 192 Fed. 507.

754

*Mr. Webster Ballinger* argued the cases, and *Messrs. Overton G. Ellis, Stuart H. Elliott, H. G. Rowland,* and *Dix H. Rowland* filed a brief, for petitioners.

*Assistant Attorney General Richardson,* with whom *Solicitor General Thacher* and *Messrs. Pedro Capo-Rodriguez* and *Paul D. Miller* were on the brief, for the United States.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

These suits were brought in the District Court for the Western District of Washington to establish and enforce asserted rights to allotments, each of 80 acres, in the Quinaielt Indian Reservation in the southwestern part of that State. Authority for bringing the suits is found in the statute providing that any person who is " in whole or in part of Indian blood or descent " and claims to be entitled to an allotment of land under any law of Congress may prosecute a suit against the United States to determine and give effect to such right.[1] The suits were heard together in the District Court, where decrees were given for the plaintiffs, and again in the Circuit Court of Appeals, where those decrees were reversed.[2] The cases are here on certiorari.

The plaintiffs are all of Indian blood and descent, but none is a full-blood Indian. Some are members of the Chehalis, Chinook and Cowlitz tribes, and the question is presented whether these tribes are among those whose members are entitled to allotments from lands within

---

[1] Act of February 6, 1901, c. 217, 31 Stat. 760.

[2] 38 F. (2d) 795, 799, 805, 806.

the Quinaielt Reservation. Many do not personally reside on the reservation, and we are asked to decide whether this defeats their claims. Some are the issue, either children or grandchildren, of a marriage between an Indian woman and a white man, and whether this is an obstacle to allowing their claims is a further question.

In 1855 the Quinaielt, Quillehute (also called Quileute), Chehalis, Chinook and Cowlitz Indians were neighhoring tribes in the southwesterly section of what is now the State of Washington. They were all known as "fish-eating Indians" and lived in small villages adjacent to the Pacific coast and the lower reaches of the Columbia River. The Quits and Ozettes were also fish-eating tribes living in coast villages a little north of the others, the Ozettes being farther north than the Quits.

During the early part of 1855 negotiations were had between a representative of the United States and representatives of the Quinaielt, Quillehute, Chehalis, Chinook, Cowlitz and Quit tribes looking towards a cession by these tribes of much territory and their consolidation within a single reservation. These negotiations failed of their full purpose, but resulted in a treaty between the United States and the Quinaielts and Quillehutes which was signed on July 1, 1855, and January 25, 1856.[3] By this treaty the Quinaielts and Quillehutes ceded a large district to the United States, and the latter engaged to reserve for their use and occupancy a tract "sufficient for their wants," to which when established they were to remove. There were also provisions in the treaty securing to the Indians the right of taking fish "at all usual and accustomed grounds and stations," in common with all citizens of that section, and of erecting temporary houses to be used in that connection; authorizing the President, at his discretion, to survey the whole or any

---

[3] 12 Stat. 971.

part of the reserved lands and assign the same to such individuals or families " as are willing to avail themselves of the privilege and will locate on the same as a permanent home "; and consenting that the President might " consolidate " the Quinaielts and Quillehutes and " other friendly tribes," whenever in his opinion the public interest and the welfare of the Indians would be promoted by it.

Under the treaty a reservation of about 10,000 acres at the mouth of the Quinaielt River was provisionally selected and its boundaries surveyed. Some years later the local superintendent reported that the reservation, by reason of being small and containing but a small amount of agricultural and pasture lands, had proved unattractive to the Indians; that the Chehalis, Chinook and other coastal tribes in southwestern Washington, like the Quinaielts and Quillehutes, who were parties to the treaty, were all " emphatically fish-eaters," drawing their subsistence almost wholly from the water, and that all of these fish-eating tribes should be collected on a single reservation, including suitable fisheries. To that end he recommended that the existing reservation be greatly enlarged and designated the territory which he believed should be included in it. This recommendation led to an order of November 4, 1873, by the President, the material parts of which are as follows:[4]

" In accordance with the provisions of the treaty with the Quinaielt and Quillehute Indians, concluded July 1, 1855, and January 25, 1856, and to provide for other Indians in that locality, it is hereby ordered that the following tract of country in Washington Territory . . . be withdrawn from sale and set apart for the use of the Quinaielt, Quillehute, Hoh, Quit, and other tribes of fish-eating Indians on the Pacific Coast, . . ."

---

[4] Executive Orders Relating to Indian Reservations (1912), p. 206.

This enlarged reservation contained about 200,000 acres and included the prior provisional reservation of 10,000 acres.

By an Act of March 4, 1911,[5] Congress directed the Secretary of the Interior to make allotments on the Quinaielt Reservation under the provisions of the allotment laws " to all members of the Hoh, Quileute, Ozette or other tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute tribes in the treaty [before named] and who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes." This direction was followed by a proviso declaring, " The allotments authorized herein shall be made from the surplus lands of the Quinaielt Reservation after the allotments to the Indians thereon have been completed." The reference to " other reservations " may be sufficiently explained by stating that some small reservations[6] had been set aside theretofore for particular villages of the Hoh, Quileute, Ozette, Quit, Chehalis and other fish-eating tribes, but that these reservations were in some instances limited to 640 acres and were in no instance large enough to provide allotments to more than a small fraction of the Indians thereon.

When the bill which became the Act of March 4, 1911, was introduced in Congress it contained a direction that allotments be made to " all members of the Hoh, Quileute and Ozette tribes of Indians in Washington who may elect " etc., and said nothing about other tribes; but in the course of its passage this provision was amended so as to read: " to all members of the Hoh, Quileute,[7] Ozette or other tribes of Indians in Washington who are

---

[5] c. 246, 36 Stat. 1345.

[6] Executive Orders Relating to Indian Reservations (1912), pp. 172–175, 195, 200, 205, 206 (Shoalwater).

[7] Through some oversight the amendment placed the Quileute tribe on both sides of the affiliation.

affiliated with the Quinaielt and Quileute [7] tribes in the treaty [before named] and who may elect," etc. This shows that Congress intended to include tribes not included in the original provision; and it shows further that they were to be tribes having, like the Hoh and Ozette tribes, some affiliation with the Quinaielt and Quileute tribes "in the treaty." Probably "in" was used in the sense of "under" or "through." Strictly speaking there was no affiliation in the treaty. But the treaty did contain a provision under which affiliation might be brought about. It authorized the President to consolidate the Quinaielt and Quileute tribes with other friendly tribes. Under this provision he made the order establishing the enlarged reservation for the use, not only of the Quinaielt and Quileute tribes, but also of the Hoh, Quit and other coastal tribes of fish-eating Indians "in that locality," evidently meaning in that section of the Territory of Washington.

That was a step towards consolidation. Other steps followed, one being that in 1905 the Indian Bureau began making allotments to members of all of these tribes. This work was carried on under the treaty, the executive order and the general allotment law, and it had progressed prior to the Act of 1911 to the point where over 750 allotments had been completed, more than half of which were to members of the various fish-eating tribes in that section other than the Quinaielt and Quillehute. It therefore was altogether appropriate at that time to speak of these other tribes as affiliated with the Quinaielt and Quillehute under the treaty.

The action of the administrative officers under the Act of 1911 has been almost uniformly in accord with the view just stated. In 1913 a bill was introduced in Congress to amend the Act of 1911 by specifically including the Cowlitz and some other fish-eating tribes in southwestern Washington not before named in the Act; and in a letter

responding to an inquiry about the need for the bill the Indian Bureau said: " It is believed that the Indians referred to in the pending bill may be allotted on the Quinaielt Reservation and that further legislation is unnecessary." The Solicitor for the Department of the Interior so construed the treaty, executive order and Act of 1911 in an opinion rendered to the Secretary of the Interior, and that opinion was accepted as a guide in making further allotments. Possibly it was not followed when the administrative officers were dealing with the applications of the plaintiffs in these suits. As to that we are not advised. The record contains a stipulation showing that the applications were rejected but not disclosing the grounds of that ruling.

Our conclusion on the first question presented is that the Chehalis, Chinook and Cowlitz tribes are among those whose members are entitled to take allotments within the Quinaielt Reservation, if without allotments elsewhere. The Circuit Court of Appeals held otherwise in some of the suits and in this we think it erred.

The Act of 1911 does not purport to make the right to an allotment dependent on a personal residence on the reservation. It is a special act relating only to this reservation. The land within the reservation is generally covered with a heavy growth of timber and is difficult of clearing. As a rule the Indians are poor and would be without means of supporting themselves while attempting to clear the land. The treaty secures to them the right of taking fish at all usual and accustomed grounds. Most of them are fishermen, but a few find employment in lumber camps. Most of them have for many years resided in small villages outside the reservation. Some of the villages are within small reservations made by executive orders; but the majority of the Indians have always lived outside any reservation. When the Act of 1911 was passed more than 750 had been given allot-

ments. Of these not more than 1 out of 5 had ever resided on the reservation. It is probable that Congress was advised of the situation of these Indians when the special act was passed and carefully refrained from placing anything in the act indicative of a purpose to make personal residence on the reservation an element of the right to an allotment.

These Indians are not the usual reservation Indians. They never were placed on the reservation or required to live within its limits. Their situation is quite like that of the Walla Walla tribe which at one time engaged the attention of this Court.[8] *Hy-Yu-Tse-Mil-Kin* v. *Smith,* 194 U. S. 401, 408–12. A special act directed the allotment of the lands of that tribe. In its title the act was described as providing for allotments to the Indians " residing upon " the reservation, and in its first sentence there was a direction that allotments be made to members of the tribe " residing upon " the reservation. After stating the situation to which the act was to be applied this Court said:

" When such a large percentage of allottees upon this reservation resided, as did the appellee, elsewhere than actually upon the reservation at the date of the passage of the act of 1885, it cannot be that the act passed was intended to limit the right to an allotment to those actually residing on the reservation to the exclusion of a majority of the members of the different bands or tribes. The fact of such non-residence is presumed to have been known to Congress, and the act should be construed with reference to that knowledge. . . . The purpose would fall very far short of accomplishment were the allotments confined exclusively to those actually residing within the limits of the reservation."

While the Act of 1911 provides that the allotments shall be made under the " allotment laws of the United

[8] And see *Bonifer* v. *Smith,* 166 Fed. 846.

States," we think this provision hardly could have been intended to make any provision in those laws requiring residence applicable to the situation we have described. The Act of 1911 is not merely silent respecting residence; it directs that allotments be made to " all members " of the tribes designated who elect to take allotments upon the Quinaielt Reservation rather than on " the reservations set aside for these tribes." These words are indicative of a purpose to exclude a residential requirement.

The record shows that the officers administering the Act did not confine the allotments to Indians actually residing on this reservation or one of the small ones, and also that they informed applicants that residence was not required. Counsel for the government admit that such has been the practice, and they set forth in their brief a letter of June 13, 1930, from the Secretary of the Interior to the Attorney General, reading as follows:

" The matter of residence upon the reservation was not insisted upon as a prerequisite to allotment, either before or after the passage of the Act of March 4, 1911 (36 Stat. L., 1345) so far as the Quinaielt and other Indians mentioned in the Act or those who were affiliated with the Quinaielt in the Treaty of 1855 and 1856 are concerned. A number of allotments have been made to those who have resided away from the reservation."

These considerations require, as we think, that personal residence on the reservation be held not essential under the Act of 1911 to the right to an allotment. The Circuit Court of Appeals took and applied the opposite view and in this we think it erred.

We come then to the question respecting the status of the issue, either children or grandchildren, of a marriage between an Indian woman and a white man.

The rule is general that, in the absence of provision to the contrary, the right of individual Indians to share

in tribal property, whether lands or funds, depends on tribal membership and is terminated when the membership is ended.[9] Under the operation of this rule an Indian woman loses her tribal membership where she marries a white man, separates from the tribe and lives with him among white people. But it is the separation from the tribe rather than the marriage which puts an end to the membership. The marriage usually serves to explain the separation and illustrate that it is intentional and permanent. But where the woman remains in the tribal environment and continues the tribal affiliation the memship is not affected. If the husband be a citizen of the United States, the woman by the marriage becomes also a citizen,[10] but there is no incompatibility between tribal membership and United States citizenship.

The children of a marriage between an Indian woman and a white man usually take the status of the father; but if the wife retains her tribal membership and the children are born in the tribal environment and there reared by her, with the husband failing to discharge his duties to them, they take the status of the mother.

Whether grandchildren of such a marriage have tribal membership or otherwise depends on the status of the father or mother as the case may be, and not on that of a grandparent.

As to marriages occurring before June 7, 1897, (as the marriages here did) between a white man and an Indian woman, who was Indian by blood rather than by adoption,—and who on June 7, 1897, or at the time of her death, was recognized by the tribe,—the children have

---

[9] *Cherokee Nation* v. *Hitchcock,* 187 U. S. 294, 307; *Gritts* v. *Fisher,* 224 U. S. 640, 642; *Sizemore* v. *Brady,* 235 U. S. 441, 446; *La Roque* v. *United States,* 237 U. S. 62, 66; *Oakes* v. *United States,* 172 Fed. 304, 307.

[10] Act August 9, 1888, c. 818, 25 Stat. 392.

the same right to share in the division or distribution of the property of the tribe of the mother as any other member of the tribe, but this is in virtue of the Act of June 7, 1897.[11]

So far as can be determined from the record the District Court rightly applied the rules stated in this opinion. The record does not purport to contain, and evidently does not contain, all the evidence that was produced on the hearing. The statement of it was prepared by counsel for the Government and the certificate is that the statement contains "all the evidence essential to the decision of the questions presented by the appeal of the defendant." The assignment of errors, which was then before the District Court, does not challenge the decision of any question of fact, but only rulings on questions of law. It is thus rather plain that the statement of evidence contains only so much of the evidence as was deemed essential to the decision of the latter. We now are asked to consider questions not raised by the assignment of errors and which cannot be properly decided without appropriate assurance that the record contains all the evidence that is material to their decision. We must decline to consider them.

> *Decrees of Circuit Court of Appeals reversed.*
>
> *Decrees of District Court affirmed.*

---

[11] c. 3, 30 Stat. 90. Other modifications of the general rule are found in the Acts of March 3, 1875, c. 131, § 15, 18 Stat. 420; February 8, 1887, c. 119, § 6, 24 Stat. 390; August 9, 1888, *supra*, § 2; May 8, 1906, c. 2348, 34 Stat. 182. And see Act June 2, 1924, c. 233, 43 Stat. 253,