WhitAkeR, Judge,
delivered the opinion of the court:
Plaintiff sues for the value of the lands of which it alleges it has been deprived as a result of the erroneous location of its northern boundary.
By a treaty between the United States and plaintiff and the Quillehute Indians entered into on July 1, 1855, and January 25, 1856, respectively, and ratified by the Senate on March 8, 1859, these Indians ceded to the United States all the lands to which they laid claim except a tract “sufficient *832 for their wants within the Territory of Washington to be selected by the President of the United States and hereafter surveyed or located and set apart for their exclusive use * *
No selection was made by the President until November 4, 1873, but in September 1861 the then Superintendent of Indian Affairs for Washington Territory, W. W. Miller, had a survey made of a tract of land on the Pacific Coast, and this was set apart by him for the use of the Quinaielts and the Quillehutes, and some or all of the members of these tribes have continued to reside upon it.
On October 1, 1872, the then Superintendent of Indian Tribes for Washington Territory, R. H. Milroy, recommended that the so-called reservation be enlarged by the addition to it of a tract of land which he described as follows:
Commencing at the northwest corner of the reservation at tidewater, on the ocean-beach, thence north with the tidewater of said beach to half a mile north of the mouth of the Queetshee River, thence easterly with the course of said river three miles, thence southeasterly to the northwest point of Quinaielt Lake, thence easterly and southerly around the east shore of said lake to the most southerly end of the same, thence southwesterly in a direct line to the northeast corner of the present reservation.
This was approved, and on November 4,3873, an Executive Order was issued formally designating the reservation as provided for by the Treaty of 1859. It included the reservation selected by Superintendent Miller. It was described as follows:
Commencing on the Pacific coast at the southwest corner of the present reservation, as established by Mr. Smith in his survey under contract with Superintendent Miller, dated September 16, 1861; thence due east, and with the line of said survey, 5 miles to the southeast corner of said reserve i#ius established; thence in a direct line to the most southerly end of Quinaielt Lake thence northerly around the east shore of said lake to the northwest point thereof; thence in a direct line to a point a half mile north of the Queetshee River and 3 miles above its mouth; thence with the course of said *833 river to a point on the Pacific coast, at low-water mark, a half mile above the mouth of said river; thence southerly, at low-water mark, along the Pacific to the place of beginning.
The controversy is over the location of the northwest point of the Quinaielt Lake. Plaintiff claims it is at the point marked “A” on the map mentioned in finding 1 (appendix No. 2 to this opinion); the defendant claims it is at point “B” shown thereon.
Point “B” was adopted by the defendant, and the lands lying between a line drawn from it to the northwest corner of the reservation and a line drawn from Point “A” to the northwest corner have been patented to others or have been held by defendant adversely to plaintiff.
Point “B” is at Mile Post 32% on the meander of the Lake. The defendant says the northwest point of a body of water is that point which is first touched by a line drawn north 45° east, and which does not pass through any portion of the water, and that this is at Point “B.” This may or may not be a rule applicable in some cases, but it is clearly not applicable here. Its application to this body of water fixes the point not at the northwest, but at substantially the southwest point of the Lake.
The call in the Executive Order is from the “most southerly end of Quinaielt Lake, thence northerly around the east shore of said Lake to the northwest point thereof.” If defendant were correct in its position, the call would have had to read: thence northerly and southerly around the east and west shores of the Lake to the point where a line drawn north 45° east first touches the Lake. The call of the Executive Order runs only in a northerly direction, not southerly, and it runs only along the eastern shore, and not southerly down the western shore.
Superintendent Milroy, in describing the land to be added to the reservation, began at the northwest corner of the old reserve, and thence went north along the shore of the Pacific Ocean to a point on the ocean a half mile north of the mouth of the Queetshee Eiver, thence three miles easterly with the course of the river, and from there the description continues: “thence southeasterly to the northwest po'nt of Quinaielt *834 Lake, thence easterly and southerly around the east shore of said Lake to the most southerly end of the same * * The description of the northern and eastern boundary in the Executive Order is the same as Superintendent Milroy’s. It is apparent that Superintendent Milroy did not have in mind point “B” as being the northwest point of the Lake. If he had had, his description would have read: thence southeasterly to the northwest point of Quinaielt Lake, thence easterly and northerly and then southerly and west-wardly around the shores of said Lake to the most southerly end of the same.
Point “B” fits neither the description in the Executive Order nor Superintendent Milroy’s description.
Point “A” is the point fixed by the Surveyor General. Both Indian Agent Eells and the Commissioner of Indian Affairs recognized it as the point intended by the Executive order. Point “B” was adopted from a consideration of expediency only, as shown by the letter of the Commissioner of Indian Affairs to the Secretary of the Interior. He says:
In view of the facts, however, as stated by Agent Eells, that the Indians are not settled upon any portion of the lands affected by the confusion in the boundaries at this point, and that white settlers have located thereon, I do not think that this point should be insisted upon if the western line can be run so as to retain the lands occupied by the Indians. It is suggested that the recommendations of Agent Eells be carried into effect — that is, that the north-west point of the lake be accepted as being located at “B” on the blueprint showing the lake. * * *
It seems to us clear that the northwest point, as that expression was used in the Executive Order, is that place on the western shore which is farthest north. This is the only point that fits the call of the Executive Order and Superintendent Milroy’s recommendation. This is at Mile Post 28% on the meander of the Lake.
But defendant says that this plaintiff is not entitled to recover the value of the lands lying between the correct northern boundary and the one adopted, because under the treaty and the Executive Order other tribes are entitled to an interest in the reservation.
*835 The treaty was entered into with both the Quinaielts and the Quillehutes, and article VI of it provided that these tribes might be consolidated with other friendly tribes or bands for the purpose of occupying and enjoying the reservation; hence, when the Executive Order establishing the reservation was issued, acting under the authority of article VI, it set aside the reservation not only for the Quinaielts and the Quillehutes, but also for the Hohs, Quits, and other tribes of fish-eating Indians on the Pacific Coast. And the Supreme Court held in Halbert v. United States, 283 U. S. 753, that the Chehalis, Chinook, and Cowlitz tribes were entitled to equal rights in the reservation because they came within the designation of fish-eating Indians on the Pacific Coast.
It is plain, therefore, that the Quinaielts are not entitled to exclusive rights in the reservation. The Quillehutes, Hohs, Quits, Chehalis, Chinook, and Cowlitz tribes are also entitled to an interest therein.
The lands taken are those lying west of Quinaielt Lake and between a line drawn from the 32% Mile Post on the meander of the Lake, in accordance with the Executive Order, to the northwest corner of the reservation, and a line drawn from the 28% Mile Post on the meander of the Lake, in accordance with the Executive Order, to the northwest corner of the reservation. What part of the value of these lands plaintiff is entitled to recover, if any, is not shown by the proof.
Judgment will be reserved for further proceedings under Rule 39 (a). It is so ordered.
MaddeN, Judge; LittletoN, Judge; and Whaley, Chief Justice, concur.
JoNes, Judge, took no part in the decision of this case.

*0