Jessie SHORT et al.

v.

The UNITED STATES.

No. 102–63.

United States Court of Claims.

Oct. 17, 1973.

Harold C. Faulkner, San Francisco, Cal., attorney of record, and William C. Wunsch, San Francisco, Cal., for plaintiff. Wallace Sheehan and Faulkner, McComish & Wunsch, San Francisco, Cal., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Jerry C. Straus, Washington, D. C., for Hoopa Valley Tribe, amicus curiae. Wilkinson, Cragun & Barker, Angelo A. Iadarola, Richard A. Baenen and Alan I. Rubinstein, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS,

SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to a recommended decision filed May 22, 1972, by Trial Judge David Schwartz pursuant to Rule 134(h). The court has considered the case on the briefs and oral arguments of counsel for the parties and the amicus curiae. The court agrees with the decision as hereinafter set forth, rejects the objections and exceptions of defendant and amicus, and hereby affirms and adopts the decision as the basis for its judgment in this case. Insofar as defendant and amicus curiae have presented arguments to the court which differ from those presented to the trial judge, the court has considered them but does not deem any change in the trial judge's opinion or findings is called for. The court has, however, excised from the findings the trial judge's notes which he indicates were not intended as findings.

Subsequent to the trial judge's decision and the oral argument before the court, the Supreme Court decided Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). We consider the trial judge's opinion and findings, and our decision herein, to be fully consistent with the opinion and decision in that case. Although the ultimate issues in the two cases are different, several aspects of the Supreme Court's opinion tend substantially toward supporting our holding in the present case.

It is concluded, therefore, that certain of the plaintiffs are entitled to recover in amounts to be determined under Rule 131(c), and the claims of the others are set down for retrial, as provided in findings 217–218. The case is remanded to the trial judge for further proceedings. The motion of the Hoopa Valley Tribe to intervene is granted.

## OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

In 1876, a 12-mile square tract of land in Northern California, on the last reach of the Trinity River before it joins the Klamath River, was set aside by order of President Grant as the Hoopa Valley Indian Reservation. Most but not all of the Indians of the tract, called the Square, were and have been Hoopa Indians. In 1891 President Harrison made an order extending the boundaries of the reservation to include an adjoining 1-mile wide strip of land on each side of the Klamath River, from the confluence of the two rivers to the ocean about 45 miles away (in consequence of which the reservation took on the shape of a square skillet with an extraordinarily long handle). Most of the Indians of the added tract, called the Addition, were and have been Yurok Indians, also known as Klamaths.

The Square is heavily timbered and in the last 20 years the timber on its unallotted trust-status lands has begun to produce revenues of about $1 million annually. These revenues, administered by the United States as trustee for the Indian beneficial owners, have been divided by the Secretary of the Interior exclusively among the persons on the official roll of the Hoopa Valley Tribe, an organization created in 1950, whose membership rules limit enrollment to allottees of land on the Square, non-landholding "true" Hoopas voted upon by the Tribe, and long-time residents of the Square of a prescribed degree of Hoopa blood, descended from natives of the Square.

The plaintiffs are 3,323 Indians, in the main Yuroks of the Addition and their descendants, who are ineligible for membership in the Hoopa Valley Tribe and have thus been denied a share in the revenues from the Square. They bring this suit against the United States as their trustee for a money judgment for their alleged share in the timber income, claiming it as all-reservation property. The Hoopa Valley Tribe, in a sense the real party defendant, is present in the case as an amicus curiae aligned with the defendant; the position of the Government and the Tribe are identical and the two have filed joint briefs. (References to defendant or to the Government will therefore mean the Hoopa Valley Tribe as well.)

To simplify the litigation, the cases of 26 plaintiffs believed to be representative of the 3,323 were chosen for trial with the expectation that if the plaintiffs as a group were upheld on the common issue, resolution of the sample cases would develop standards by which the parties could dispose of many or most of the remaining cases. The first order of business is therefore the basic issue of whether the Indians of the Addition may be excluded from sharing in the revenues of the communal lands of the Square.

The history of the reservation may be succinctly stated: It was established in 1864 pursuant to the Act of April 8, 1864, 13 Stat. 39, its boundaries were in 1865 provisionally determined to be what has since been called the Square, formally so defined by an order of President Grant in 1876 and extended to include the Addition by order of President Harrison in 1891. The act of 1864 is the basis of the claims of all parties. No claim is made of any title or right antedating or overriding the statute or the authority exercised thereunder.

The plaintiffs contend that as Indians of the Addition, they are entitled to share in the resources of the entire reservation, including the Square. The enlargement of the reservation in 1891 formed, they maintain, a single, integrated reservation to which all the Indians on both the Square and the Addition got equal rights in common. The contrary position of the Government is that the Square survived the enlargement of the reservation in 1891 as an entity whose resident Indians had vested substantive rights, exclusive as against the Indians of the Addition. The executive order of 1891, the Government says, joined the Square and the Addition for

administrative purposes only, not for purposes of substantive rights, and without effect on already vested rights of the Indians of the Square, now organized as the Hoopa Valley Tribe. The controversy is decided here in favor of plaintiffs, for the reasons which follow.

On August 21, 1864, Austin Wiley, the federal Superintendent of Indian Affairs for California, in a public notice "located" a reservation, to be called the "Hoopa Valley Reservation," "situated" on the Trinity River in Klamath County.[1] A second notice in February of the following year defined the boundaries of the "Hoopa Reservation" as a square tract bisected by the last 12 miles of the Trinity River before its junction with the Klamath and extending 6 miles on each side of the Trinity.[2]

Eleven years later, on June 23, 1876, President Grant in an executive order precisely defined the "exterior boundaries" of the "Hoopa Valley Indian Reservation" in accordance with a survey, and declared that the 89572.43 acres embraced therein were "set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864."[3] The circumstances surrounding the establishment and enlargement of the reservation are described in the accompanying findings of fact.

Neither the public notices of 1864 and 1865 nor the executive order of 1876 mentioned any Indian tribe by name, nor intimated which tribes were occupying or were to occupy the reservation. In this they were consistent with the

---

1. "By virtue of power vested in me by an act of Congress approved April 8, 1864, and acting under instructions from the Interior Department, dated at Washington City, D.C., April 26, 1864, concerning the location of four tracts of land for Indian reservations in the State of California, I do hereby proclaim and make known to all concerned that I have this day located an Indian reservation, to be known and called by the name and title of the Hoopa Valley Reservation, said reservation being situated on the Trinity River, in Klamath County, California, to be described by such metes and bounds as may hereafter be established by order of the Interior Department, subject to the approval of the President of the United States. Settlers in Hoopa Valley are hereby notified not to make any further improvements upon their places, as they will be appraised and purchased as soon as the Interior Department may direct."

"Austin Wiley,
"*Superintendent Indian Affairs for the
State of California*
"Fort Gaston, Cal., *August 21, 1864*"

2. "*To Whom, It May Concern:*
"Be it known that by virtue of power vested in me by Act of Congress passed April 8th, 1864, and acting under instructions from the Department of the Interior, I have located and set aside for an Indian Reservation the following described tract of land to be known as the Hoopa Reservation: Beginning at a point where Trinity River flows into Hoopa Valley and following down said stream, extending six miles on each side thereof, to its junction with Klamath River, as will be more particularly described by a map of said Reservation.

"Notice is hereby given to all persons not to settle or improve upon said Indian Reservation excepting as the Agent in charge may permit and in no manner to trespass thereon on or interfere therewith.

"Free transit through the Reservation will be permitted all travelers, pack-trains and stock, subject to such restrictions as the local Agent may see proper to impose.

"Austin Wiley,
"*Supt. Ind. Aff's, Cal.*"
"Hoopa Reservation, Cal.
"*February 18th 1865.*"

3. "Executive Mansion,
"*June 23, 1876*
"It is hereby ordered that the south and west boundaries and that portion of the north boundary west of Trinity River surveyed, in 1875, by C. T. Bissel, and the courses and distances of the east boundary, and that portion of the north boundary east of Trinity River reported but not surveyed by him, viz: 'Beginning at the southeast corner of the reservation at a post set in mound of rocks, marked 'H. V. R., No. 3'; thence south 17½ degrees west, 905.15 chains, to southeast corner of reservation; thence south 72½ degrees west, 480 chains, to the mouth of Trinity River,' be, and hereby are, declared to be the exterior boundaries of Hoopa Valley Indian Reservation, and the land embraced therein, an area of 89,572.43 acres, be, and hereby is, withdrawn from public sale and set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864. (13 Stats., p. 39.)"

"U.S. Grant"

statute whose authority was being exercised, the Act of April 8, 1864, 13 Stat. 39. That act, cited by both public notices and by the executive order, authorized the President in his discretion to locate not more than four Indian reservations in California, at least one of them to be in the northern district of the state, of such extent as he deemed suitable for the accommodation of the Indians of the state, all without mention of any tribe by name.

Section 2 of the act read as follows (13 Stat. 40):

Sec. 2. That there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for whch they are intended: *Provided,* That at least one of said tracts shall be located in what has heretofore been known as the northern district: * * * *And provided, further,* That said tracts to be set apart as aforesaid may, or may not, as in the discretion of the President may be deemed for the best interests of the Indians to be provided for, include any of the Indian reservations heretofore set apart in said state, and that in case any such reservation is so included, the same may be enlarged to such an extent as in the opinion of the President may be necessary, in order to its complete adaptation to the purposes for which it is intended.

The powers conferred by this statute are to be construed in keeping with the broad connotations of the words employed: "at his discretion," "suitable extent," "accommodation of the Indians," "practicable" and "due regard." South Puerto Rico Sugar Company Trading Corp. v. United States, 334 F.2d 622, 631–632, 167 Ct.Cl. 236, 260–261 (1964),

cert. denied, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965). It is not disputed that the President had complete discretion as to which tribes were to be located on any of the reservations. The number of the tribes to occupy a reservation was also a matter for Presidential decision. There were many Indian tribes in California; in the north, in the area of the Hoopas and the Yuroks, almost every river and creek had its own tribe. Since there were to be no more than four reservations in the state—less, if the President so decided—it was inevitable that each reservation could and almost certainly would be occupied by more than one tribe. How many tribes was left to the President; the President would in his discretion adjust the size of a reservation to the number of tribes and Indians to be accommodated.

Given such a statutory scheme, faithfully reflected by the omission of reference to any Indian tribe in the notices of 1864–65 and the executive order of 1876, the Hoopa Indians could get no vested or preferential rights to the Square from the fact alone of being the first or among the first to occupy the Square with Presidential authority. The sequence in which tribes were authorized to occupy a reservation gave no rights. Any exercise of the President's discretion in favor of the Hoopas, in approving their residence on the reservation, gave the Hoopas no vested rights as against such other tribe as might be the beneficiary of a simultaneous or subsequent exercise of the President's discretion. Hynes v. Grimes Packing Co., 337 U.S. 86, 103, 69 S.Ct. 968, 93 L. Ed. 1231 (1949); Healing v. Jones, 210 F.Supp. 125, 138, 153, 170 (D.Ariz. 1962), aff'd 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963); Crow Nation v. United States, 81 Ct.Cl. 238, 278 (1935).

It is claimed by defendant, however, that the Hoopas were the sole aboriginal occupants of the Square. The legal consequences were this claim upheld, as against the statute and the President's authority, need not be gone into, for the claim of fact is unfounded. The accom-

panying findings recount that the Hoopas shared the Square with at least some Yuroks, whose native villages ranged along the Klamath River from the ocean to the Trinity—the area later to become the Addition—to the banks of the Trinity near the Klamath. This conclusion of fact as to the presence of Yuroks on the Square prior to white settlement does not, of course, support the claim of the present plaintiff Yuroks of the Addition, who were not introduced into the reservation until 1891, but it does negate the claim of the defendant insofar as it is based upon original exclusive Hoopa occupancy of the Square.

Another contention is that vested rights in the Square were conferred upon the Hoopas under a treaty made by Wiley at the time he established the reservation in 1864. This treaty, which made peace with the Hoopas and several other tribes then at war with the United States, obligated the United States "to set aside for reservation purposes for the sole use and benefit of the tribes of Indians herein named, or such tribes as may hereafter avail themselves of the benefit of this treaty, the whole of Hoopa Valley, to be held and used for the sole benefit of the Indians whose names are hereunto affixed as the representatives of their tribes." It is conceded that this promise was not a treaty in the constitutional sense. Its making was not authorized, and it was not ratified. Its text is found as an attachment to a report by Wiley printed in the annual report for 1864 of the Superintendent of Indian Affairs; it is there captioned "Treaty of peace and friendship between the United States government and the Hoopas, South Fork, Redwood, and Grouse Creek Indians."

Putting aside any question of the binding quality of this document, it is not properly to be read as having sought to restrict the President's discretion under the act of 1864 or to give rights in the reservation to some tribes and withhold them from others. Within the week of the making of the treaty, Wiley in his first public notice locating the "Hoopa Valley Reservation" described the reservation only as an "Indian reservation" without any reference to who should occupy it. In the setting in which the treaty was presented to the Indians who agreed to it, described in the accompanying findings, the treaty is properly to be construed as a promise to devote Hoopa Valley to an Indian reservation for those tribes that would cease their hostilities and live at peace with the United States. So understood, the Klamaths or Yuroks were among its beneficiaries, for they laid down their arms and thenceforth remained at peace with the United States. There is good ground for concluding that though the caption of the treaty did not mention the Klamaths (Yuroks) as original parties, they were entitled to its benefits as among the tribes to whom the treaty was in fact presented and who were thereby persuaded to lay down their arms.

It is perfectly plain that from the outset in 1864 all involved understood that the reservation was intended for an undetermined number of tribes including the Hoopas and the Klamaths, and that the authorities repeatedly acted on this assumption. Some Yuroks already lived in the Square in 1864 and others were soon settled there, according to the best data on the peoples of the reservation. Within a fortnight of his first notice locating the reservation, Wiley reported the precise names of the tribes occupying every reservation in California except the Hoopa Valley Reservation; the Hoopa Valley Reservation, he said, contained "Various tribes." Soon thereafter Hoopas, Klamaths, and Redwoods appear as residents of the reservation. Saiaz, Wiyot, Wylackie and Sinkyone Indians were moved to the reservation from elsewhere (and apparently did not remain, at least identifiably). In 1869 Wiley's successor had a plan (not executed, for reasons which do not appear) to move 1800 Klamath Indians to the reservation. The Klamath River Reservation (occupied by Yuroks and constituting the ocean end of what later be-

came the addition to the Hoopa Valley Reservation) had been destroyed by flood in 1861, and efforts to resettle its Indians, Yuroks, had not been successful. The 1800 Klamaths were thus probably the forebears of the present plaintiffs.

The annual report of the Commissioner of Indian Affairs for 1872 stated that the Indians in the care of the agency at Hoopa Valley were the Humboldts (Wiyots and others), Hoonsoltons, Miscolts, Saiaz and several other bands, numbering 725. The reservation on the Trinity, the Commissioner said, "was set apart per act of April 8, 1864, for these and such other Indians in the northern part of the State as might be induced to settle there." And in the years between the executive orders of 1876 and 1891 the Commissioner's annual reports contained a table giving the names of the tribes "occupying or belonging" to the various reservations. For the Hoopa Valley Reservation, the tribal names given were Hunsatang, Hoopa, Klamath River, Redwood, Saiaz, Sermalton, Miskut and Tishtanatan. During all these years, therefore, it was well understood that the reservation contained several tribes and was intended for whatever tribes might be settled there by authority of the President.

When, therefore, President Harrison by executive order of October 16, 1891 extended the boundaries of the reservation to include the contiguous strip of land along the Klamath River, there were no vested rights to the Square incapable of divestment, or at least dilution, by a Presidential introduction of additional tribes into the reservation. There could be no such rights in view of the President's authority under the act

of 1864 and the manner of its exercise to that time.

The terms of the executive order (text in the note [4]) described the reservation as created under the act of 1864, and "extended" its "limits" "so as to include" the tract since called the Addition. No qualification was imposed on the incorporation of the Addition into the reservation, except that tracts on the Addition privately owned under the land laws were "excluded from the reservation as hereby extended."

Such words in an executive order, in this respect no different than the statute by whose authority it was made, are "to be read in their natural and ordinary sense, giving them a meaning to their full extent and capacity, unless some strong reason to the contrary appears (Miller v. Robertson, 266 U.S. 243, 250, [45 S.Ct. 73, 69 L.Ed. 265] (1924)." No reason to the contrary appearing, the order is to be given its natural effect of granting to the Indians of the Addition, as Indians of the enlarged reservation, rights in the reservation equally with the Indians of the Square.

The order has been held to be a lawful exercise of the President's "continuing authority," under the act of 1864, within his "large discretion" concerning the exercise of that authority, to "alter and enlarge" the reservation "from time to time in the light of experience." Donnelly v. United States, 228 U.S. 243, 256–257, 33 S.Ct. 449, 453, 57 L.Ed. 820 (1913). The President had no less power to enlarge a reservation created under the act of 1864 than he had to locate it originally. Five prior Presidents—Presidents Grant, Hayes, Garfield, Arthur and Cleveland—the Supreme Court noted, had made similar orders, with re-

---

4. "Executive Mansion, *October 16, 1891*" "It is hereby ordered that the limits of the Hoopa Valley Reservation in the state of California, a reservation duly set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in said State, by Act of Congress approved April 8, 1864, (13 Stats., 39), be and the same are hereby extended so as to include a tract of country one mile in width on each side of the Klamath

River, and extending from the present limits of the said Hoopa Valley reservation to the Pacific Ocean; Provided, however, That any tract or tracts included within the above described boundaries to which valid rights have attached under the laws of the United States are hereby excluded from the reservation as hereby extended."

"Benj. Harrison"

spect to the reservations authorized by the act, "altering and enlarging the bounds of the reservations, restoring portions of their territory to the public domain, and abolishing reservations once made, and establishing others in their stead; and in numerous instances Congress in effect ratified such action." Donnelly v. United States, *supra* at 258, 33 S.Ct. at 453.

As already noted, the plain and natural consequence of the order was the creation of an enlarged, single reservation incorporating without distinction its added and original tracts upon which the Indians populating the newly-added lands should reside on an equal footing with the Indians theretofore resident upon it. This the President was as free to do under the reserved powers granted him by the act of 1864 as he had been free in the early years, without enlarging the reservation, to settle Redwoods, Saiaz and others and as he would have been free in 1869 to settle upon the reservation the Yuroks of the Klamath River Reservation. In introducing the Yuroks of the Addition into the enlarged reservation in 1891, on a basis of equality with their kinsmen and the several other tribes already there, the President was merely continuing to accommodate the tribes of the area in the Indian reservation in Northern California he had established under the act of 1864. Compare Halbert v. United States, 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931) and Quinaielt Tribe v. United States, 102 Ct.Cl. 822 (1945), on the President's power to enlarge a treaty reservation for the common benefit of the tribe originally settled there and tribes "in that locality."

Although the purpose of the executive branch in enlarging the reservation would seem to be apparent from the facts, the defendant reaches a different result entirely; it contends that the purpose of the executive order was to join the parts of the enlarged reservation only technically, for administrative purposes only, the Indians of each tract to retain their rights in their respective tracts. No hint of such a purpose appears on the face of the executive order. And no support for such purpose appears in the data said by defendant to prove it—the background and origins of the executive order and of legislation affecting the Klamath River Reservation, a part of the Addition. An exhaustive inquiry into the data, set out in detail in the accompanying findings, fails to reveal even a mention of such a purpose as defendant asserts, much less the compelling showing which would be required to curtail the ordinary consequences of the executive order.

The executive order originated in the Administration's desire to give reservation status to the Connecting Strip and the Klamath River Reservation, the latter then recently held by the courts to be an abandoned Indian reservation and threatened by Congress with a bill for its public sale. The object was to provide the legal basis for expulsion of white traders from the area and for the allotment of land in severalty to the Indians of the area, under the General Indian Allotment Act of February 8, 1887 as amended (24 Stat. 388, 26 Stat. 794). Any qualification on the incorporation of the Addition into the reservation would have jeopardized the desired status, for only four reservations were permitted in California under the act of 1864 and four were already in existence. Full reservation status could come only from a bona fide merger of the Addition into the reservation, not a "technical" joinder, "for administration only," of a reservation with a dubious status to one of lawful status. In the enlarged reservation resulting from such a merger, there could be only equal rights for all Indians of the reservation.

Administrative opinions, in the years following the executive order of 1891, recognized both that a number of tribes including Klamaths, Hoopas and other tribes were entitled to rights on the res-

ervation and, with pointed relevance to the instant case, that the Indians of the Addition and the Square were equal in respect to rights in the lands of the Square. These opinions are described in the accompanying findings. In one of them, in 1916, it was ruled that the Hoopas, Klamaths and several other tribes were entitled to rights on the reservation. In another, in 1933, it was determined that allotments of land on the Square should cease, and assignments of land contingent on cultivation be substituted, because, it was held, the Indians of the Addition and the Square were equally entitled to allotment of lands and there was insufficient land for all those entitled.

Defendant attacks these rulings as erroneous, as made by men of lesser rank and as covering only a short span of years. The rulings were sound, they were made by, among others, a Commissioner, a Chief Clerk of the Indian Office in 1916 (then the officer third in rank, next after the Assistant Commissioner), and they were made whenever there was need for them. No contrary ruling worth the mention was made in the Department of the Interior until the Secretary in 1955 began to pay the income from the Square to the Hoopa Valley Tribe and the Deputy Solicitor in 1958 wrote an opinion justifying the legality of his action. 65 Dec.Int.Dept. 59 (1958). That opinion is not supported by the defendant; the opinion does not reflect the facts found here, primarily the nonexclusive nature of the Hoopas' residence in the Square, and it proffers neither tangible support nor rational theoretical basis for its assertion that the executive order of 1891 was intended only for administrative convenience.

The baseless belief that the Indians of the Square had exclusive rights in the lands of the Square seems to have grown from the remoteness of the Addition from the Square, the roughness of the terrain of the former, and the different stock of their respective inhabitants. The error flowered during the inordinate delay—from 1894 to 1922—between the time of allotment of Addition lands and allotment of land on the Square. The Indians of the Square, deprived for so long of allotments, became understandably jealous and possessive for the entire Square.

The 1891 executive order, however, withstands all attacks. It was fully authorized by the act of 1864. No vested Indian rights in the Square existed, and the effect of the order was to enlarge both the area and the population of the reservation, without any limitation on the rights of all the Indians in the communal lands of the enlarged reservation.

Turning to the cases of the 26 individual plaintiffs, stated in detail to the findings, it appears that 22 of them, named in the accompanying ultimate findings and conclusions, are sufficiently proven to be Indians of the reservation to warrant a determination now that they are entitled to recover, in amounts to be calculated after all the 3,323 claims are tried and determined. In the cases of the remaining four, there are questions—of possible loss of reservation rights or of degree of Indian blood—as require that their cases be retried or rebriefed, as seems indicated in each case. With the common issue of exclusive right out of the way, the parties through their counsel will presumably be able to address themselves to the individual claims, and agree upon standards for the recognition of individual claims. There should be no reason to insist upon a formal appearance by each claimant in court. Sworn testimony may be given by affidavit or in the equivalent of a deposition, followed by stipulation for judgment where no contest is planned.