Argued November 22, 1978, reversed February 20, petition for
review denied July 10, 1979

STATE OF OREGON, *Respondent,*
*v.*
EUGENE S. GOODELL, *Appellant.*
(No. CC76-53, CA 10736)
590 P2d 764

Hayes Patrick Lavis, Astoria, argued the cause for appellant. With him on the brief were Anderson, Fulton, Lavis & Van Thiel, and G. C. Fulton, Astoria.

Melinda L. Bruce, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Lee and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Defendant, a Chinook Indian, appeals his conviction of fishing in the Columbia River without a commercial fishing license (ORS 508.025, 508.235). He argues: (1) The Treaty of Olympia (12 Stat 971), entered into in 1855 between the United States and the Quinault and Quileute tribes, reserves to the signatory tribes "the right of taking fish at all usual and accustomed grounds and stations * * * in common with all citizens of the Territory"; (2) although not a signatory of the Treaty of Olympia, the Chinook tribe is affiliated with the Quinault tribe for purposes of the treaty; and (3) members of the Chinook tribe, or at least those who are also enrolled in or are qualified for enrollment in the Quinault tribe, have the right under the treaty to fish at the usual and accustomed grounds and stations of the Chinooks. The state responds: (1) The Chinooks were not a signatory of the treaty; (2) the only express right given to affiliated tribes by the Treaty of Olympia was to be consolidated with the signatory tribes for purposes of reservation allotments; (3) no fishing rights were reserved to the Chinooks by the treaty; and (4) the treaty reserves fishing rights to the Quinaults or the tribes affiliated with them to fish only at the usual and accustomed grounds and stations of the Quinaults and not at those of the affiliated tribes.

In addition to its principal contentions, the state makes two other arguments, which can be summarily disposed of. First, it asserts that "[a]n individual's right to share in treaty rights or property depends on tribal membership" and under 25 CFR § 256.3 the federal Commission of Indian Affairs is authorized to issue fishing identification cards only to persons furnishing proof of "current tribal enrollment or evidence of entitlement to such enrollment." Defendant was not carrying such a card at the time of his alleged offense, and he was not an enrolled member of the Quinault tribe at that time. However, he had applied for enrollment before his arrest and he had become an

enrolled member by the time of trial. The federal regulation the state relies on provides only that failure to have an identification card is *prima facie evidence* that "the person is not entitled to exercise an Indian fishing right under a treaty of the United States." 25 CFR § 256.3(g).

■ The state also makes the closely related argument that because of his failure to have an off-reservation *tribal* fishing identification card with him at the time of his arrest, the defendant was in contravention of tribal regulations and was therefore subject to state authority.[1] The state relies on *State v. Gowdy,* 1 Or App 424, 462 P2d 461 (1969), but *Gowdy* is inapposite. The defendants there were in violation of tribal regulations pertaining to the time and method of fishing. We did not contemplate in *Gowdy* that an individual's enjoyment of treaty fishing rights could be lost because of an infraction of tribal rules which do not relate to the actual manner of exercising those rights.

Both of the state's identification card arguments are answered by the following language from *United States v. State of Washington,* 384 F Supp 312 (WD Wash 1974), *aff'd* 520 F2d 676 (9th Cir 1975), *cert den* 423 US 1086, 96 S Ct 877, 47 L Ed 2d 97 (1976):

> "Any person exercising a treaty fishing right must have his identification as specified in paragraph 5 of this injunction on his person or risk lawful arrest by [state authorities], *although it may later be determined or asserted as a successful defense in a criminal prosecution that such person was exercising a federally protected Indian treaty right to fish."* 384 F Supp at 415. (Emphasis added; *see also* 384 F Supp at 408.)

---

[1] The United States District Court's opinion in *United States v. State of Washington,* 384 F Supp 312 (WD Wash 1974), *aff'd* 520 F2d 676 (9th Cir 1975), *cert den* 423 US 1086, 96 S Ct 877, 47 L Ed 2d 97 (1976), indicates that the Quinaults have satisfied the prerequisites for self-regulation, including issuance of identification cards. It is therefore questionable whether the identification procedures under 25 CFR § 256.3 were applicable to this defendant.

The issue before us, then, is whether the defendant is correct in his assertion that members of the Chinook tribe enjoy a right under the Treaty of Olympia to fish at the usual and accustomed grounds and stations *of that tribe.* The parties have stipulated that the defendant's alleged offense took place at a usual or accustomed fishing location of the Chinooks. The state also concedes that the defendant is a member of the Chinook tribe and has been at all material times. Although the parties do not call it to our attention, we take judicial notice of ORS 508.285, which requires the payment of a fee for the procurement of a commercial fishing license. The United States Supreme Court held in *Tulee v. State of Washington,* 315 US 681, 62 S Ct 862, 86 L Ed 1115 (1942), that the states cannot require license fees from persons who have treaty fishing rights as a condition of exercising those rights.

To decide this case requires an analysis of three factors: first, the historical and legal relationship of the Chinook tribe to the Treaty of Olympia; second, the nature of the fishing rights reserved by that treaty to the signatory tribes — in particular, the Quinaults; and third, the nature of the fishing rights, if any, reserved by or conferred upon nonsignatory tribes, with particular attention to whether such tribes have the right to fish at *their* usual and accustomed stations in addition to or instead of the usual and accustomed locations of the signatory tribes with which they are affiliated.

The history of the Treaty of Olympia was analyzed by the United States Supreme Court in *Halbert v. United States,* 283 US 753, 51 S Ct 615, 75 L Ed 1389 (1931), and by the United States District Court in *United States v. State of Washington, supra.*[2] In

---

[2] *Cf., United States v. McGowan,* 62 F2d 955 (9th Cir 1933), *aff'd* 290 US 592 (1933), the dicta in which are inexplicable in the light of *Halbert* and which are in any event irrelevant after the Ninth Circuit opinion in *United States v. Washington.*

*Halbert* the Supreme Court also analyzed the relationship of the Chinooks and other affiliated tribes to the treaty.

The Treaty of Olympia was one of several treaties negotiated by the United States with various Pacific Northwest tribes in the mid-1850's. The treaty was concluded on July 1, 1855, and parties to it were the United States and the Quinault and Quileute tribes. Article 3 of the treaty provides, as pertinent (and in language which substantially duplicates that of the other treaties consummated between the United States and various tribes of Pacific Northwest Indians at approximately the same time):

> "The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory * * *."

The treaty's only reference to tribes other than the signatories appears in Article 6, which provides, as material:

> "The President may hereafter, when in his opinion the interests of the Territory shall require, and the welfare of the said Indians be promoted by it, remove them from said reservation or reservations, to such other suitable place or places within said Territory as he may deem fit, * * * or may consolidate them with other friendly tribes or bands * * *: and he may further at his discretion, cause the whole or any portion of the lands to be reserved, or such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege * * *."

In 1873, President Grant promulgated an executive order providing for the enlargement of the reservation established by the treaty from 10,000 acres to 200,000 acres and that space on the enlarged reservation be available to members of the "Hoh, Quit, and other tribes of fish-eating Indians on the Pacific Coast" as well as to members of the tribes which were signatories to the treaty. By an Act of 1911 (36 Stat 1345), Congress directed the Secretary of the Interior to make allotments on the enlarged reservation

"* * * to all members of the Hoh, Quileute, Ozette or other tribes of Indians in Washington or affiliated with the Quinaielt and Quileute tribes in the treaty [before named] and who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes."

The Supreme Court held in *Halbert* that members of the Chinook and certain other tribes were affiliated with the Quinault and were entitled to allotments on the Quinault reservation pursuant to the Treaty of Olympia, the 1873 executive order and the 1911 Act. *Halbert* does not address the question whether, along with the land allotments, members of the nonsignatory tribes acquired any fishing rights through the treaty or the presidential or congressional actions.[3]

■ In *United States v. State of Washington, supra,* the federal district court defined the Quinault tribe (for purposes of the treaty and the treaty's current implementation) as

"* * * the present day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest of some of the Indian tribes or bands which were parties to the Treaty of Olympia. This tribe is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Quinault Reservation and *is composed of the Quinault* and Queets Band of Indians, *and other fish-eating Indians of the Olympic Peninsula who were allotted on the Quinault Reservation.*" 384 F Supp at 374. (Emphasis added.)

---

[3]No treaty was consummated between the United States and the Chinooks. In the early 1850's, the Chinooks did sign a treaty purporting to cede to the United States the tribe's aboriginal lands. The treaty was not ratified by the United States Senate, but it has nevertheless been held that the unratified treaty, together with the assumption by the United States of "control over the aboriginal title area," was effective to divest the Chinooks of their aboriginal territories. *Chinook Tribe v. United States,* 6 Indian Cl Comm'n 177 (1958). Our research does not disclose that the Chinooks have ever been held to have retained or acquired anything pursuant to the unratified treaty, notwithstanding the Indian Claims Commission's conclusion that the tribe's aboriginal title was extinguished by that seeming legal nullity.

As noted, it was held in *Halbert* that the Chinooks were among the Indians entitled to allotments on the Quinault reservation. The federal district court's inclusion of such peoples in the definition of the "Quinault tribe" "with respect to the matters that [were] the subject of" the litigation in *United States v. State of Washington, supra,* means that the Chinooks enjoy off-reservation fishing rights under the Treaty of Olympia as well as entitlement to allotments on the reservation; the subject of the litigation was off-reservation fishing rights. The question to which we now turn, therefore, is what off-reservation fishing rights were reserved by the treaty to the signatory tribes and to the affiliated tribes.

At this point in history, there is at least some confusion about the *quantum* of off-reservation fishing rights reserved by the Treaty of Olympia and the other treaties which were consummated at approximately the same time. The federal district and circuit courts held in *United States v. State of Washington, supra,* that treaty fishing rights are "reserved and protected under the supreme law of the land, [do] not depend on state law, [are] distinct from rights or privileges held by others, and may not be qualified by any action of the state." 384 F Supp at 402. The federal courts further held that state regulation was permissible only to the extent that it does not discriminate against the treaty tribes' reserved right to fish, meets appropriate standards of substantive and procedural due process, and is "both reasonable and necessary to preserve and maintain the resource." 384 F Supp at 402. To the same effect, *see Puyallup Tribe v. Washington Game Dept.,* 433 US 165, 97 S Ct 2616, 53 L Ed 2d 667 (1977), and *Sohappy v. Smith,* 302 F Supp 899 (D Or 1969).

In addition, the district and circuit courts also held that the treaty tribes were entitled to approximately 50 percent of the harvestable catch of anadromous fish, as against "[other] citizens of the Territory." Although the United States Supreme Court denied

certiorari in *United States v. State of Washington, supra,* the percentage apportionment of the harvestable catch has remained the subject of continuing litigation. In *Washington State Com'l Passenger v. Tollefson,* 89 Wash2d 276, 571 P2d 1373 (1977), the Washington Supreme Court purported to nullify the apportionment actions of state officials who sought to comply with the federal court's decision in *United States v. State of Washington, supra.* Conversely, in *Puget Sound Gillnetters Ass'n v. U. S. Dist. Ct.,* 573 F2d 1123 (9th Cir 1978), the Ninth Circuit upheld the federal district court's enforcement actions, and commented:

> "Except for some desegregation cases [cites omitted], the district court has faced the most concerted official and private efforts to frustrate a decree of a federal court witnessed in this century." 573 F2d at 1126.

The United States Supreme Court has granted certiorari in both the *Tollefson* and *Puget Sound Gillnetters* cases. —— US ——, 99 S Ct 276-77, 58 L Ed 2d 255 (1978).

■ The controversy over the apportionment of the harvestable catch does not bear on the issue we are called upon to decide. The decisive question in this case is whether the defendant has *any* fishing rights at the usual and accustomed fishing location of the Chinook tribe where he was cited, and not whether the tribe is entitled to a particular allocation of the harvestable catch at that location. As a member of the Chinook tribe, the defendant is affiliated with the Quinault for purposes of the Treaty of Olympia and enjoys off-reservation fishing rights under that treaty. Whether those rights encompass fishing at the usual and accustomed grounds and stations of the Chinooks, as well as or instead of the usual and accustomed Quinault grounds and stations to which the treaty makes express reference, is the narrow issue.

Persuasive support for the defendant's position that Chinook fishing rights under the Treaty of Olympia

[ 519 ]

extend to the usual and accustomed fishing locations of that tribe is found in the Ninth Circuit's opinion in *United States v. State of Washington, supra,* which affirmed the District Court's ruling that the Muckleshoot tribe was a treaty tribe. The Muckleshoots are a tribal entity established in 1857, after the relevant treaties were signed, and consist of various tribes and bands, some of which were and some of which were not parties to the treaties. The state of Washington argued that at least those members of the Muckleshoot tribe who are not "descended from a tribe or band which was represented at the signing of one of the treaties" do not possess treaty fishing rights. In rejecting that contention, the Court of Appeals stated:

> "The Muckleshoot Indian Reservation, named after the prairie on which it is located, was established in 1857, two years after the treaties were signed. It was occupied by Indians who earlier had been represented at Medicine Creek and at Point Elliott, as well as by some Indians who apparently were parties to neither of those treaties. The reservation was an arbitrary grouping; no Muckleshoot Tribe had previously existed. Nevertheless, the inhabitants of the reservation today are recognized as a tribe by the United States. * * *"
>
> "* * * * *
>
> "The state's principal fear seems to be that members of the Muckleshoot Tribe will be able to use the traditional areas of all the merged tribes, affording them special rights. The argument is specious. The member of every tribe composed of smaller bands possesses rights similarly more extensive than those of any one of his direct ancestors. The treaty Indians are restricted to the opportunity to take up to 50 percent of the harvestable catch at traditional areas. Each Indian can fish at but one location at a time, so that the state's concern that he is accorded double the treaty rights to which he is entitled is unfounded." 520 F2d at 692.

Under the Ninth Circuit's holding, *all* Muckleshoots are entitled to fish at the usual and accustomed places of *any* signatory *or nonsignatory* tribe or band which *now* stands in the same relationship to the Muckleshoots as do the Chinooks to the Quinaults. It follows

that members of a nonsignatory tribe have the right, by virtue of affiliation with or constituency of a treaty tribe, to exercise treaty fishing rights at its own usual and accustomed tribal fishing locations.[4]

The state cites *Sac and Fox Tribe of Indians of Oklahoma v. United States,* 315 F2d 896 (Ct of Claims 1963), for the proposition that "an Indian tribe obtains no legal rights from a treaty to which it is not a contracting party." 315 F2d at 899. However, the facts in *Sac and Fox Tribe* were in sharp distinction to those here. As the Court of Claims stated:

> "Indeed, it would be natural for the United States to bind itself only to those tribes which obligated themselves to the United States. We find nothing in the negotiations, or the treaty instructions, or the general contemporaneous references to the Greenville Treaty * * * to cause us to modify our statement * * * that 'the tribal representatives to the [Greenville] treaty understood that the United States was dealing with each tribe independently of the others and that boundaries would be established as between the various tribes by future negotiations' [cite omitted]. The other tribes were representing themselves, and not acting on behalf of the Sacs and Foxes, in signing the treaty. *Nor were the latter third party beneficiaries of the compact, or somehow brought within its reach by affiliation or association.* * * *" 315 F2d at 899. (Emphasis added.)

Here, the Chinooks are affiliated with the Quinaults for purposes of the Treaty of Olympia and for purposes of the fishing rights reserved by that treaty.

We hold that the defendant had a treaty right to fish without a commercial license at the location

---

[4]We recognize that the geographical area which was involved in *United States v. State of Washington, supra,* did not involve any part of Oregon or the Columbia River. Nonethless, the legal and constitutional principles in that case for the interpretation and implementation of the treaty fishing rights are not limited by geography. The same basic principles were enunciated in *Sohappy v. Smith,* 302 F Supp 899 (D Or 1969), and in a subsequent ancillary enforcement proceeding (*see Sohappy v. Smith,* 529 F2d 570 (9th Cir 1976)), as applicable to the Columbia River.

where the alleged offense occurred, and we therefore reverse.

Reversed.